STROUD, Judge.
 

 *341
 
 This case arises from petitioner's appeal from a trial court order affirming the administrative law judge's decision to affirm respondent's termination of petitioner's employment. Because the administrative law
 
 *380
 
 judge's order was based upon substantial evidence and was in accord with the applicable law, and the trial court conducted a proper review of the administrative law judge's order, we affirm the trial court order.
 

 I. Background
 

 This summary of the facts is based upon the administrative law judge's ("ALJ") findings of fact in the final agency decision ("decision").
 

 *342
 
 The ALJ made 260 findings of fact-approximately 40 pages, single-spaced-detailing the history of petitioner's light sensitivity all the way back to her "late teens" when she first noticed the problem, through her employment with respondent, and up to the inception of her claim. Upon petition to Superior Court, the trial court found that there was substantial evidence to support all of the findings of fact. Petitioner has, in one cursory final issue, challenged many of these extensive findings of fact on appeal, but because she has failed to properly present this argument on appeal, as discussed below, we accept the ALJ's findings of fact as binding upon this Court.
 
 [1]
 

 Garrett v. Burris
 
 ,
 
 224 N.C.App. 32
 
 , 34,
 
 735 S.E.2d 414
 
 , 416 (2012),
 
 aff'd per curiam
 
 ,
 
 366 N.C. 551
 
 ,
 
 742 S.E.2d 803
 
 (2013) ("Plaintiff does not challenge any of the trial court's findings of fact as unsupported by the evidence. These findings, therefore, are binding on appeal."). The decision shows that petitioner's employer took many actions to accommodate her light sensitivity throughout the entire process of their working relationship. We will not list every single accommodation respondent made for petitioner for the sake of brevity but will note many of them.
 

 In August of 2002, petitioner was hired by respondent's Department of Medicine and Genetics to work as a part-time, temporary administrative assistant. Petitioner informed Ms. Sikes, petitioner's supervisor, that exposure to fluorescent lights caused her to have migraine headaches.
 
 [2]
 
 In 2004, petitioner became a permanent employee as a social clinical research assistant. Between approximately 2002 and 2004, Ms. Sikes informally accommodated petitioner's light sensitivity by allowing her to work in an office with a window where petitioner could use the natural light and avoid turning on her overhead lights. In 2005, petitioner's entire department moved to a new building where petitioner's new work station was in a cubicle. To accommodate petitioner, the overhead lights in the general work area remained off and this lack of lighting did to some extent affect other employees. In 2010, the department was scheduled to move again and Ms. Sikes suggested petitioner check out the new workspace and allowed her "to design her own work space[.]"
 

 In February 2010, the department moved and for "the first time all [of] the genetic counselors were working together in one shared space."
 

 *343
 
 Most of the employees were in cubicles. Petitioner was working in a cubicle directly across a corridor from Ms. Sikes's office. In her office, Ms. Sikes used only one of her two sets of overhead florescent lights. The overhead lights over the entire cubicle area were initially kept off, while another department, sharing the same overall space but not grouped with petitioner's department, kept the lights on over their workspace. Although the main lights over petitioner's workspace were turned off, petitioner was still exposed to fluorescent lights from the other department's lights, the emergency lights, bathroom lights, and lights by the elevator. Respondent then disengaged some of the emergency lights around petitioner's cubicle. Other employees began using floor and desk lamps in their workspaces to accommodate the dark conditions. Petitioner also began complaining about sensitivity to fragrances, so respondent posted signs asking the employees to cease wearing scented products. Overall, during the time period from moving into the new space in February of 2010, until November of 2011, the department effectively completed its work.
 

 *381
 
 During this same time period, respondent also had to make constant adjustments to the lighting due to complaints by other employees that their work areas were too dark. Petitioner specifically complained that she had headaches caused by the supplemental lighting in the cubicle adjoining hers, where Ms. Lee worked. Because it was closest to petitioner's cubicle, Ms. Lee's cubicle was the darkest workspace. Ms. Lee tried different combinations of lighting and changed light bulb wattages, but petitioner remained dissatisfied.
 

 In November of 2011, while petitioner was on vacation and without Ms. Sikes's knowledge, Ms. Lee submitted a work order to have the overhead lights above petitioner's cubicle and directly to the left and right of it disabled. Once this was done, the department began using the overhead lights again since the overhead lights in petitioner's immediate vicinity were disabled. On 19 November 2011, petitioner went to work but eventually got a headache that lasted until the next day. On 21 November 2011, petitioner informed Ms. Sikes that the new lighting conditions would not work for her. Ms. Sikes contacted respondent's disability office for assistance. A formal request from petitioner was needed to begin disability accommodations, so on 27 November 2011, petitioner expressed her desire to move forward with the formal accommodation process.
 

 On 30 November 2011, Ms. Phillips, the employee working with petitioner and respondent from the disability's office, responded to petitioner about beginning the formal process of accommodation. On
 
 *344
 
 6 December 2011, petitioner submitted a form to Ms. Phillips requesting accommodations and provided a letter from her doctor regarding her sensitivity to light. Ms. Phillips began corresponding with many individuals about accommodations, and during this time petitioner asked on multiple occasions that all overhead lights be turned back off, but this request was not initially allowed. Ms. Phillips then suggested perhaps petitioner could work from home, but petitioner refused. In December of 2011, Ms. Lee was moved to a different workspace so that all of the lights could remain off while petitioner was at work.
 

 On 12 January 2012, respondent installed panels on top of petitioner's cubicle to block out the overhead lights from other areas. Tack boards were then added on top of the panels to block more light. The lights immediately above and around petitioner's cubicle remained disengaged, but the following day, petitioner said the modification did not work. On 17 January 2012, petitioner again requested the overhead lights in the entire area remain off until a solution could be found. Ms. Phillips informed Ms. Sikes that petitioner would come back to work on 19 January 2012, if the lights were turned off for her, but Ms. Sikes did not agree.
 

 Petitioner then refused to allow Ms. Phillips to speak to her healthcare provider about other possible accommodation options and rejected the idea of room-darkening glasses. Petitioner also again rejected the idea of working from home. On 20 January 2012, taller partitions were installed to the cubicle to raise the walls; new tack boards were also installed. Petitioner's cubicle walls were approximately nine feet high at this point.
 

 During January and February of 2012, petitioner attended work sporadically and suffered from a migraine "essentially every day she tried to work[.]" During February of 2012, petitioner still refused to work from home or to allow Ms. Phillips to speak with her healthcare provider. On 10 February 2012, solid panels were installed from the floor to the ceiling on petitioner's cubicle; part of the cubicle had been left open during the prior modification at petitioner's request because she wanted to allow natural light from that area.
 

 On 14 February 2012, petitioner claimed the accommodation did not work, continued to complain about Ms. Lee's supplemental lighting, and claimed she could not walk to areas like the copier and scanner. Respondent then moved the copier and scanner into petitioner's "darkened area[.]" Petitioner then requested Ms. Sikes put up black paper to
 
 *345
 
 block the lights from her office, although these lights had never been a problem before, and she also requested breaks. The next
 
 *382
 
 day, on 15 February 2012, all of the cubicle walls were raised to the ceiling; this same day petitioner requested that the gaps where the walls touched the ceiling be duct taped and that Ms. Sikes keep her office door closed. Petitioner still believed Ms. Lee's supplemental lighting was part of her problem though petitioner was never clear on the source of her problem and complained about issues which she had originally not mentioned.
 

 On 17 February 2012, petitioner requested a door and a roof for her cubicle, but Ms. Phillips declined these accommodations since petitioner's workspace was now much darker than it had been before November of 2011 when the formal accommodation process began. Also, the additions to the walls already reached the ceiling. Petitioner also made modification requests prior to the previous set of requests even being made. Ultimately in late February 2012, petitioner requested leave under the Family Medical Leave Act which was approved from 22 February 2012 to 21 May 2012. The communications regarding modifications continued and respondent made numerous other modifications.
 

 On 9 March 2012, petitioner requested a transfer to another position; respondent denied this request but informed her that she was free to apply for any position she desired. During her leave, petitioner wore special room-darkening glasses to block fluorescent light, although when she had been at work she complained they made her nauseous. On 21 May 2012, petitioner returned to work and acknowledged her workspace was much darker than it had been in November of 2011, but petitioner's sensitivity to light had increased. On 24 May 2012, petitioner left work early due to a migraine; the next day, petitioner left work at 9:00 a.m. On 29 May 2012, petitioner again requested that Ms. Sikes be required to keep her door closed, and this accommodation was denied.
 

 After 1 June 2012, petitioner began reporting to work even less than she had been despite her workspace being its darkest yet. On 13 June 2012, petitioner received a written warning due to her absences. On 18 June 2012, petitioner applied for Family Illness Leave which was approved for two days. Thereafter, petitioner continued to miss work frequently. On 24 July 2012, respondent gave petitioner four weeks of leave without pay from 16 July 2012 until 12 August 2012. After 24 July 2012, petitioner stopped communicating with respondent and failed to return to work. On 14 August 2012, petitioner's employment was terminated. Up until this point, the accommodation process was still ongoing and had not stopped.
 

 *346
 
 On 4 September 2012, petitioner filed a petition for a contested case hearing contending that respondent "failed to accommodate" her disability. Petitioner further explained that respondent
 

 [g]ave her an unjustified final written warning, and terminated her as of August 14, 2012, when she could not return to her job following a period of leave without pay. Petitioner was unable to return to her job because of her Employer's failure to appropriately and adequately accommodate her disability, which resulted in Petitioner suffering server[e] migraine headaches and eye pain after a short time each day at her job.
 

 Petitioner has initiated a grievance concerning her discharge and under the UNC Grievance Procedure. That grievance raises the issue of lack of just cause for the discharge as well as the issues that the discharge violates Petitioner's rights under the Americans with Disabilities Act and the Family Medical Leave Act. To the extent that grievance is unsuccessful, once the process is complete, Petitioner will file a Petition for a Contested Case on those matters and move to join them with this petition.
 

 On 31 January 2013, petitioner did just that and filed a petition for a contested case hearing regarding her grievance which had been denied; petitioner moved to have the two petitions joined. On or about 26 February 2013, the chief ALJ consolidated the two petitions.
 

 Over the course of five days in October and November of 2013, an ALJ heard petitioner's case. In June of 2014, the ALJ entered a 60-page decision ultimately determining all issues in favor of respondent. On 24 July 2014, petitioner filed a 54-page petition
 
 *383
 
 with the Superior Court for review from the ALJ decision. On 22 August 2014, respondent responded to petitioner's petition, requesting that the trial court affirm the ALJ decision. In June of 2015, the trial court entered an order affirming the ALJ decision. Petitioner appeals.
 

 II. Standard of Review
 

 When the trial court considered the final agency decision its standard of review was provided by North Carolina General Statute § 150B-51 :
 

 (b) The court reviewing a final decision may affirm the decision or remand the case for further proceedings. It may also reverse or modify the decision if the
 
 *347
 
 substantial rights of the petitioners may have been prejudiced because the findings, inferences, conclusions, or decisions are:
 

 (1) In violation of constitutional provisions;
 

 (2) In excess of the statutory authority or jurisdiction of the agency or administrative law judge;
 

 (3) Made upon unlawful procedure;
 

 (4) Affected by other error of law;
 

 (5) Unsupported by substantial evidence admissible under G.S. 150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; or
 

 (6) Arbitrary, capricious, or an abuse of discretion.
 

 (c) In reviewing a final decision in a contested case, the court shall determine whether the petitioner is entitled to the relief sought in the petition based upon its review of the final decision and the official record. With regard to asserted errors pursuant to subdivisions (1) through (4) of subsection (b) of this section, the court shall conduct its review of the final decision using the de novo standard of review. With regard to asserted errors pursuant to subdivisions (5) and (6) of subsection (b) of this section, the court shall conduct its review of the final decision using the whole record standard of review.
 

 N.C. Gen. Stat. § 150B-51 (2013).
 

 As to this Court's review,
 

 [a] party to a review proceeding in a superior court may appeal to the appellate division from the final judgment of the superior court as provided in G.S. 7A-27. The scope of review to be applied by the appellate court under this section is the same as it is for other civil cases. In cases reviewed under G.S. 150B-51(c), the court's findings of fact shall be upheld if supported by substantial evidence.
 

 N.C. Gen. Stat. § 150B-52 (2013). Furthermore,
 

 *348
 
 [a]n appellate court reviewing a superior court order regarding an agency decision examines the trial court's order for error of law. The process has been described as a twofold task: (1) determining whether the trial court exercised the appropriate scope of review and, if appropriate, (2) deciding whether the court did so properly. When, as here, a petitioner contends the agency's decision was based on an error of law,
 
 de novo
 
 review is proper.
 

 Holly Ridge Assocs., LLC v. N.C. Dep't of Env't & Natural Res.
 
 ,
 
 361 N.C. 531
 
 , 535,
 
 648 S.E.2d 830
 
 , 834 (2007) (citations, quotation marks, and brackets omitted).
 

 In summary, as this case is being reviewed pursuant to North Carolina General Statute § "150B-51(c), the [trial] court's findings of fact shall be upheld if supported by substantial evidence." N.C. Gen. Stat. § 150B-52. Alleged errors of law will be reviewed
 
 de novo.
 

 Holly Ridge Assocs., LLC
 
 .,
 
 361 N.C. at 535
 
 ,
 
 648 S.E.2d at 834
 
 . Furthermore, we will review the trial court order to determine "whether the trial court exercised the appropriate scope of review and, if appropriate, ... whether the court did so properly[.]"
 

 Id.
 

 More specifically, as to our review of the trial court's scope of review, if the argument raised before the trial court asserted
 
 *384
 
 an error with the agency decision which was "(1) [i]n violation of constitutional provisions; (2) [i]n excess of the statutory authority or jurisdiction of the agency or administrative law judge; (3) [m]ade upon unlawful procedure; [or] (4) [a]ffected by other error of law[,]" we will review to consider whether the trial court properly used "the de novo standard of review." N.C. Gen. Stat. § 150B-51(c). If the argument raised before the trial court asserted an error with the agency decision which was "[u]nsupported by substantial evidence admissible under G.S. 150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; or ... [a]rbitrary, capricious, or an abuse of discretion[,]" we will review to consider whether the trial court properly used "the whole record standard of review."
 

 Id.
 

 III. Petitioner's Appeal of Findings of Fact
 

 Petitioner raises 14 issues on appeal. Petitioner's brief puts the cart before the horse by waiting until the last issue to raise any challenges to the findings of fact. Since findings of fact are required to support conclusions of law,
 
 see
 

 Beaufort Cty. Bd. of Educ. v. Beaufort Cty. Bd. of Comm'rs
 
 ,
 
 184 N.C.App. 110
 
 , 116,
 
 645 S.E.2d 857
 
 , 861 (2007) ("The trial
 
 *349
 
 court's findings of fact must support its conclusions of law in order to enter a lawful order."), if the findings of fact were not supported by substantial evidence,
 
 see generally
 
 N.C. Gen. Stat. § 150B-52, it would have been helpful for petitioner to challenge those facts
 
 before
 
 addressing alleged errors of law. After all, if material facts in the findings were not supported by the evidence, we might never need to reach at least some of the arguments regarding errors of law. Thus, we will first address the last issue which purports to challenge many of the ALJ's findings of fact. Petitioner's entire argument is as follows:
 

 Petitioner excepted in whole or in part to Findings 13, 24, 29, 30, 33, 36, 37, 53, 62, 67, 86, 90, 114, 115, 122, 123, 125, 127, 136, 137, 138, 140, 141, 142, 143, 144, 145, 146, 152, 189, 196, 203, 205, 209, 221, 222, 258, 259 and 260 [R. pp. 9-20]. The specifics as to what portion of each Finding exception was taken, is set out in each of the paragraphs of the Petition. Additionally, evidence that each Finding is at least in part wrong, is cited in each of the paragraphs. The exceptions to the specified Findings are well taken, and under the whole record test they should have each been modified or deleted.
 

 At pages 17-45 of her Petition [R. pp. 20-48], Petitioner set forth 99 additional proposed Findings that are supported by the Record. Each of those proposed Findings cites to the evidence that supports it. They are all appropriate and they should be adopted.
 

 As tempting as it may be, we decline petitioner's invitation to comb through over 1,000 pages of exhibits and her "99 additional proposed Findings" to find the substantial evidence, or lack thereof, to support the ALJ's 260 findings of fact or some portions of those findings; that is petitioner's job.
 
 See generally
 

 Carlton v. Oil Co.
 
 ,
 
 206 N.C. 117
 
 ,
 
 172 S.E. 883
 
 , 884 (1934) ("[O]n appeal the burden is on appellant to show error[.]") Petitioner likely relegated her challenge to the findings of fact to her last issue because even she acknowledges that the changes to the findings she requests are not really material changes that would make any difference in the legal analysis; she recognizes this in footnote 22 of her brief:
 

 The reference to "FOF" is to the Findings of Fact in the Decision. While Petitioner has asserted that some findings are not supported by the evidence, and that other findings should have been made,
 
 the Decision appears to contain sufficient findings to support the errors of law
 

 *350
 

 that Petitioner has raised
 
 . It is possible this Court could agree with Petitioner regarding the legal errors that she has raised, and fashion conclusions of law that are supported by the existing Findings of Fact.
 

 (Emphasis added.) We also note that our rules impose page limitations on briefs,
 
 see
 
 N.C.R. App. P. 28(j), as petitioner pointed out in her statement of the facts, but petitioner's argument essentially seeks to add many, many pages to her brief by referring us to her lengthy submissions to the ALJ and trial court.
 

 But as to petitioner's argument which refers us to the other documents in the record, we have read petitioner's petition to the trial court from the ALJ order and most of petitioner's contentions are not that the ALJ's findings of fact were not supported by the evidence, but rather further details petitioner would like to add to each finding of fact. For example, finding of fact 33 in the ALJ decision was as follows:
 

 *385
 
 33. At first, [Ms. Lee] had only one supplemental lamp, but that amount of light was insufficient. (Tr. 608). [Ms. Lee] then tried two lamps, but the lighting bothered Petitioner, so [Ms. Lee] switched the bulbs to a lower wattage.
 

 Id.
 

 Petitioner continued to express dissatisfaction with the lights used by [Ms. Lee].
 

 Petitioner's exception to this finding was as follows:
 

 21. To Finding of Fact #33 in that it does not accurately reflect the number and type of supplemental lights that [Ms. Lee] had, which were 2 floor lamps and 2 desk lamps; and it ignores the evidence that every cubicle had an under-the-shelf fluorescent light that allowed employees to have substantial light shine on matters on which they were working, which [Ms. Lee's] cubicle also had.
 

 In the context of this order, in which many other findings of fact describe the lighting conditions over time in great detail, we cannot see how the additional details of exact numbers of lamps and bulb types would have any effect upon the result. As to petitioner's highly detailed argument to portions of the findings of fact, we note that the findings of fact do not need to include every evidentiary fact, but only those necessary for the ultimate determination.
 
 See generally
 

 Kelly v. Kelly
 
 ,
 
 228 N.C.App. 600
 
 , 606-07,
 
 747 S.E.2d 268
 
 , 276 (2013) ("[T]he trial court need not recite all of the evidentiary facts but must find those material and ultimate facts from which it can be determined whether the findings are
 
 *351
 
 supported by the evidence and whether they support the conclusions of law reached." (citation omitted)).
 

 Because petitioner has failed to specifically raise an argument on appeal to
 
 any
 
 particular finding of fact, has failed to direct us to any particular portion of the record to consider a challenge to even one finding of fact, has failed to address any particular finding of fact as not supported by the evidence, and has failed to raise any issues with the findings of fact which she contends are material, we conclude that petitioner has abandoned her argument challenging the findings of fact. We will therefore accept all of the findings of fact made by the ALJ as supported by substantial evidence,
 
 see generally
 

 Garrett
 
 ,
 
 224 N.C.App. at 34
 
 ,
 
 735 S.E.2d at 416
 
 , and we will proceed to address petitioner's legal arguments.
 

 IV. Petitioner's Appeal of Conclusions of Law
 

 Petitioner challenges many of the ALJ's 49 conclusions of law in her remaining 13 issues presented in her brief on appeal. The conclusions of law she challenges are as follows:
 

 9. In this case, Petitioner was "unavailable" as (1) she was unable to return to all the position's essential duties and work schedule due to her medical condition that caused headaches and eye pain to be triggered by fluorescent lights, and (2) Petitioner and Respondent were unable to agree upon a return to work arrangement that met the agency's needs and Petitioner's medical condition. By the date of her separation, Petitioner had no leave time to cover her absence.
 

 10. Respondent met the requirements for properly separating Petitioner due to her unavailability after leave was exhausted. Respondent provided the appropriate notifications to Petitioner, awarded her four weeks of additional leave once Petitioner informed her supervisors that she was applying for short-term disability, and informed Petitioner that she was to return to work August 13, 2012 if she hadn't notified them of her short-term benefit application.
 

 11. The facts are clear and disputed that Respondent took reasonable efforts to avoid separating Petitioner from employment by notifying Petitioner that she had
 
 *352
 
 exhausted all applicable leave. Respondent granted Petitioner four additional weeks of leave without pay when it was not required to do so. Respondent's efforts to avoid separating Petitioner from employment were unsuccessful, because Petitioner, by her own volition, ceased contact with Respondent, and failed to return to work. Petitioner knew she needed to contact [Ms. Sikes] ... regarding her short-term disability application, or return to work by August 13, 2012. Petitioner understood that her failure to report on August 13, 2012 would result in her being involuntarily
 
 *386
 
 separated from employment due to unavailability. Yet, Petitioner did not report to work on August 13, 2012 or contact her supervisors. The preponderance of the evidence proved that Petitioner's actions justified Respondent involuntarily separating Petitioner from employment.
 

 12. Based on a preponderance of the evidence, all foregoing Findings of Fact and Conclusions of Law, Respondent properly separated Petitioner from employment due to Petitioner's unavailability after approved leave was exhausted under 25 NCAC .01C. 1007.
 

 ....
 

 19. The Fourth Circuit has held that an employee who cannot meet the attendance requirements of a job is not considered a qualified individual covered by the ADA. (
 
 See
 

 Tyndall v. Nat'l Educ. Ctrs.
 
 ,
 
 31 F.3d 209
 
 , 213 (4th Cir. 1994) ) In
 
 Bell
 
 ,
 
 supra
 
 . at 1-3, the US District Court for the Middle District of North Carolina held that since the Plaintiff had been absent without leave for months, and indicated she would continue to be out indefinitely, Defendant was not as a matter of law required to offer Plaintiff leave as a reasonable accommodation for her disability.
 
 Id.
 
 That Court further provided that, because the Plaintiff was not able to perform the essential functions of any job, the Defendant could not be liable because "an employer who fails to engage in the interactive process will not be held liable if the employee cannot identify a reasonable accommodation that would have been possible."
 
 Id.
 
 at 20. (quoting
 
 Wilson v. Dollar Gen. Corp.
 
 , 717 F.3 [d] 337, 347 (4th Cir. 2013)[.]
 

 *353
 
 20. In this case, Petitioner was employed on a full-time basis by Respondent yet routinely failed to work even 32 hours in a workweek. (Pet. Exs. 61-62) Her poor attendance alone means that she is not a qualified individual. However, she claims that her absences were due to exposure to fluorescent lighting in her work environment, even though she was exposed to fluorescent lighting in the same building for more than one year before November 2011. Petitioner admitted that after late November 2011, she would come to work and routinely notify her supervisor that she had a migraine and had to leave. Respondent had to rely, necessarily, on Petitioner's subjective reports regarding her pain. Even with these reports, Respondent was still entitled to have reasonable work expectations for Petitioner's attendance.
 

 21. After returning without any restrictions from her twelve weeks of FMLA in May 2012, Petitioner immediately had attendance problems, and was counseled about the importance of being at work. Respondent made it clear to Petitioner that she must adhere to her approved work schedule to "ensure we have the office and phone coverage necessary during normal/working business hours." (Resp. Ex. 79) Petitioner's attendance continued to be sporadic, and fell considerably short of either a 32 or 40-hour workweek requirement. (Pet. Exs. 61 & 62) Since Petitioner refused to allow Respondent to speak with the medical providers, Respondent did not know that Dr. Kylstra meant Petitioner remained unable to work with fluorescent lights.
 

 22. Petitioner failed to produce any binding legal precedent to support her allegation that her work environment aggravated her disability, and caused her absences.
 

 23. Cases in the Fourth Circuit have held that the cause of Petitioner's incapacity is irrelevant to whether she is able to perform the essential duties of her job, especially in absen[ce of] any bad faith on Respondent's part. An employer does not violate the ADA[ ] when it "discharges an individual based upon the employee's misconduct, even if the misconduct is related to a disability."
 
 Rocha v. Coastal Neuropsychiatric Crisis Servs.
 
 PA,
 
 979 F.Supp.2d 670
 
 (E.D.N.C. 2013)
 

 *354
 
 (
 
 citing
 

 Jones [v]. Am. Postal Workers Union
 
 ,
 
 192 F.2d 417
 
 , 429 (D.C. Cir. 1951) ).
 

 24. Discharging an individual because of the specific attributes of a disease, (for instance, firing an employee with epilepsy for seizures) is fundamentally different than firing an employee for disability-related misconduct that is not itself the disability.
 
 Martinson v. Kinney Shoe Corp.
 
 [,]
 
 104 F.3d 683
 
 , 686 (4th Cir. 1997)
 

 *387
 
 The
 
 Martinson
 
 Court further held that, "By contrast, misconduct-even misconduct related to a disability-is not itself a disability, and an employer is free to fire an employee on that basis."
 

 Id.
 
 at 686
 
 . (citing
 
 Tyndall
 
 , supra. at 214 ). The
 
 Tyndall
 
 Court ruled that:
 

 Because [the employee's] attendance problems rendered her unable to fulfill the essential functions of her job, and because these problems occurred even with [her employer's] more than reasonable accommodations for her own disability, we hold that she was not a ["]qualified individual with a disability[ ]" as required by § 12111(a) of the ADA.
 

 (
 
 Tyndall
 
 , supra. at 214 )[.]
 

 25. In the present case, the preponderance of the evidence proved that Petitioner was not separated from employment because of her light sensitivity, but she was separated from employment because she failed to report to work, an essential element of her office position. For the foregoing reasons, Petitioner is not a "qualified individual with a disability."
 

 26. Assuming that Petitioner met the first criterion of being a qualified individual entitled to the protection of the ADA, Petitioner still did not establish the second criterion that Respondent discriminated against Petitioner. Even if Petitioner is a qualified individual with a disability, Respondent met its obligations to accommodate her in a reasonable manner. "Reasonable accommodation" is defined as:
 

 modifications or adjustments to the work environment, or to the manner or circumstances under
 
 *355
 
 which the position is held or desired, is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position.
 

 29 C.F.R. § 1630.2
 
 (o) (2012) The ADA affirms that the employer's judgment is a major factor in the Court's assessment of what constitutes a job's "essential functions."
 
 42 USC § 12111
 
 (8). The reasonableness of an accommodation is assessed objectively, not subjectively from the concerns of either party. See
 
 Williams v. Channel Master Satellite Sys., Inc.
 
 ,
 
 101 F.3d 346
 
 (4th Cir. 1996) [.]
 

 27. The employer is not required to provide an accommodation that reallocates an essential job function or that causes an undue hardship. "Undue hardship" means:
 

 [Significant difficulty or expense incurred by [an employer], taking into consideration factors such as the nature and cost of accommodation, the type of operation of the covered entity, and the impact of the accommodation upon the operation of the facility, including the ability of other employees to perform their duties and the facility's ability to conduct business.
 

 29 CFR § 1630.2
 
 (p)(1)-(2) [.]
 

 28. The preponderance of evidence at hearing established that Respondent engaged in an extensive, interactive process with Petitioner to determine what accommodations would be reasonable. Petitioner consistently requested accommodation that the overhead lights over the entire Genetics Counseling Group remain turned off. However, under the applicable case law, Respondent is not required to provide Petitioner the exact accommodation requested, but only to provide an objectively reasonable accommodation, which Respondent did in this case. Throughout the entire interactive process, Petitioner was provided an opportunity to participate in the accommodation process.
 

 29. Respondent physically modified Petitioner's workspace per Petitioner's request and specifications. Respondent deemed Petitioner's requests-to hang black
 
 *356
 
 curtain as a door to Petitioner's office, to keep Ms. [Sike's] door closed at all times, and to turn off all overhead lights (pre-November 2011 lighting conditions)-unreasonable due to the impact on other employees' abilities to perform their work, and the unit's ability to conduct business. Ultimately, Respondent modified Petitioner's workspace to be darker than it was before November 2011. (Resp. Ex. 78)
 

 30. The interactive accommodation stopped only because Petitioner ceased contact with her supervisors once she left work on July 2, 2012. Petitioner admitted
 
 *388
 
 she knew Respondent would continue to work with her upon her return to work, but Petitioner failed to return to work by her own volition.
 

 31. A preponderance of the evidence proved that Respondent provided a series of modifications to accommodate Petitioner reasonably, while reducing the impact on her coworkers, despite Petitioner's unwillingness to allow Respondent to speak with her treating physicians.
 

 32. To the extent Petitioner attempted to bring a retaliation claim pursuant to ADA, Petitioner failed to establish a causal link between her seeking accommodations and her separation. Although Petitioner's supervisors, and coworkers certainly expressed frustration and personal hostility toward Petitioner and with the lengthy accommodation process, there was no credible evidence Respondent retaliated against Petitioner for seeking that accommodation. The evidence at hearing established that Respondent followed each modification that ... [the disability office] suggested.
 

 33. Petitioner relied on
 
 McMillan v. City of New York
 
 ,
 
 711 F.3d 120
 
 (2nd Cir. 2013) to argue that Respondent must show that the informal lighting accommodation before November 2011 is no longer reasonable, and was a[n] undue burden on Respondent. However, Petitioner's reliance is misplaced for several reasons. First,
 
 McMillan
 
 is not a 4th Circuit case, and therefore, is not binding in this case, but merely persuasive. Second, Petitioner failed to cite any North Carolina or 4th Circuit case applying the
 
 *357
 
 ruling in
 
 McMillan
 
 in this State. Third, the
 
 McMillan
 
 Court ruled that a previous arrangement with an employee could be a
 
 factor
 
 in determining what constituted a reasonable accommodation. It did not rule that the employer was required to prove that an informal accommodation is unduly burdensome to the employer before the employer can remove the accommodation without violating the ADA.
 

 34. Despite Petitioner's argument, a previous accommodation does not tie the employer's hands and force the employer to continue to offer the accommodation. "The fact that certain accommodations may have been offered by the County [employer] to some employees as a matter of good faith does not mean that they must be extended to Myers [another employee] as a matter of law."
 
 Myers v. Hose
 
 ,
 
 50 F.3d 278
 
 , 284 (4th Cir. 1995) [.] Similarly, in
 
 Perrin v. Fennell
 
 , No. 1:10-CV-810,
 
 2011 WL 837008
 
 , at *1-*2,
 
 2011 U.S. Dist. LEXIS 21730
 
 , at *1-*6 (E.D.Va. Mar. 2, 2011), the Fourth Circuit held that:
 

 [T]he fact that FLSS [the employer] had previously granted Perrin [employee] a similar request is irrelevant. An employer's one time, goo[d] faith offer of accommodations does not bind the employer to extend similar offers in the future. ... [s]uch a regime would discourage employers from treating disabled employees in a spirit that exceeds the mandates of federal law.
 

 Id.
 
 at *7,
 
 2011 U.S. Dist. LEXIS 21730
 
 , at *19-*20.
 

 35. Based on the above case law, Respondent in this case is not bound by the ADA to continue to offer Petitioner the previous accommodation of having all the overhead lights over the Genetic Counseling Group turned off. From a policy standpoint, holding employers liable for prior efforts that went beyond federal law would discourage them from accommodating above the bare minimum federal requirements.
 

 36. Based on all foregoing Findings of Fact and Conclusions of Law, Respondent met its obligations to provide Petitioner with reasonable accommodations under the ADA.
 

 *358
 
 37. For the foregoing reasons, Petitioner failed to establish that Respondent terminated her from employment based on her disability. (See
 
 EEOC v. Stowe-Pharr Mills, Inc
 
 .,
 
 216 F.3d 373
 
 , 377 (4th Cir. 2000) ).
 

 Retaliation for Requesting an Accommodation
 

 38. The third issue is whether Respondent retaliated against Petitioner for requesting an accommodation pursuant to the ADA.
 

 *389
 
 39. The ADA prohibits employers from retaliating against employees who seek accommodations pursuant to the statute. 42 U.S.C. 12203(a) provides that "[n]o person shall discriminate against any individual because such individual ... made a charge ... under this Chapter."). (See
 
 42 U.S.C. § 12203
 
 (a) ;
 
 A Soc'y Without a Name, for People without a Home, Millennium Future-Present v. Virginia
 
 ,
 
 655 F.3d 342
 
 , 350 (4th Cir. Va. 2011) (holding that an employee claiming retaliation claim under the ADA, must establish a causal link exists between the protected conduct and the adverse action).
 

 40. A preponderance of the evidence showed that Petitioner did not establish a causal link between her protected activity and any adverse action by Respondent. Petitioner was separated from employment due to her unavailability for work. At the time of her separation, the ADA accommodation process was still ongoing.
 

 Each of petitioner's 13 remaining issues on appeal relates to one or more of the contested conclusions of law.
 

 A. Petitioner's Brief
 

 We have had some difficulty determining which conclusions of law were addressed by each argument. For example, petitioner notes Conclusions of Law No. 26 and/or 36 in her "ISSUES PRESENTED" numbered 1, 4, 5, 6, 7 and 8. But the argument section of her brief has sections lettered A through N, instead of numbered as they were in the "issues presented" section; furthermore, the numbered issues do not necessarily coincide with the lettered sections of the argument. For example, the first issue presented, issue number 1, argues the ALJ and Superior Court erred in determining respondent had made a reasonable accommodation while the first argument, letter A, is entitled "Discrimination Under Title I of the ADA" and provides the general framework for making a
 
 *359
 
 claim under the ADA, the American With Disabilities Act. Even if we ignore the "ISSUES PRESENTED" section entirely, the headings of the lettered sections also do not directly relate to particular issues; again, letter A in the argument section is a general restatement of the law and the facts from petitioner's perspective without any contentions for this Court to review.
 
 [3]
 
 But with that caveat, we have attempted to match up petitioner's arguments to the issues as best we can.
 

 B. Title I of the ADA
 

 Petitioner's arguments are based almost entirely upon Title I of the ADA.
 

 To prevail on an ADA claim, the plaintiff must prove that: (1) she has a disability as defined by the ADA; (2) she is qualified for the job; and (3) she was unlawfully discriminated against by an employer because of her disability.
 

 Under the ADA, the term disability is defined as a physical impairment that substantially limits one or more of the major life activities of such individual. ...
 

 Only a qualified individual with a disability may prevail on a discrimination claim under the ADA. The term qualified individual with a disability means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. Essential functions of the job are the fundamental job duties of the person with the disability that bear more than a marginal relationship to the job at issue.
 

 The term reasonable accommodation may include-
 

 (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
 
 *390
 

 *360
 
 (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modification of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.
 

 Johnson v. Trustees of Durham Tech. Cmty. Coll.
 
 ,
 
 139 N.C.App. 676
 
 , 684-85,
 
 535 S.E.2d 357
 
 , 363 (2000) (citations, quotation marks, ellipses, and brackets omitted).
 

 Petitioner brought claims under the ADA for her wrongful discharge arguing that respondent's failure to make reasonable accommodations for her disability so that she could continue working ultimately led to her discharge. The ALJ determined that petitioner's claims failed because
 

 Petitioner was not separated from employment because of her light sensitivity, but she was separated from employment because she failed to report to work, an essential element of her office position. For the foregoing reasons, Petitioner is not a "qualified individual with a disability" [pursuant to the ADA,]
 

 and even
 

 [a]ssuming that Petitioner met the first criterion of being a qualified individual entitled to the protection of the ADA, Petitioner still did not establish the second criterion that Respondent discriminated against Petitioner. Even if Petitioner is a qualified individual with a disability, Respondent met its obligations to accommodate her in a reasonable manner.
 

 Again, "[t]o prevail on an ADA claim, the plaintiff must prove that: (1) she has a disability as defined by the ADA; (2) she is qualified for the job; and (3) she was unlawfully discriminated against by an employer because of her disability."
 
 Id.
 
 at 684,
 
 535 S.E.2d at 363
 
 . The parties do not dispute that petitioner's light sensitivity which leads to migraine headaches is a "disability" as defined by the ADA, and for purposes of this opinion we will assume petitioner "is qualified for the job."
 
 [4]
 

 Id.
 

 Thus, all
 
 *361
 
 that remains to consider is plaintiff's contention that "she was unlawfully discriminated against by an employer because of her disability."
 

 Id.
 

 In this particular case, the alleged discrimination is petitioner's termination. Therefore, the crucial issue is whether "Respondent met its obligations to provide Petitioner with reasonable accommodations under the ADA" because if respondent met its obligation to "provide Petitioner with reasonable accommodations under the ADA[,]" then petitioner's failure to return to work would be without legal justification and that would be a proper ground for termination, not a discriminatory one, as the ALJ determined. Thus, we will therefore first address the issue of reasonable accommodation under the ADA.
 

 C. Reasonable Accommodation
 

 Petitioner's arguments on appeal which relate to the issue of reasonable accommodations under the ADA are scattered throughout several sections of her brief. Petitioner contends as follows:
 

 At Conclusions 9 through 12, the Decision finds that Ms. Rittelmeyer was properly "separated due to unavailability", and the just cause issue she raised was never reached. These conclusions constitute error because Respondent did not prove "that reasonable efforts were taken to avoid separation" as required by 25 NCAC 01C.1007(c)(2). Ms. Rittelmeyer stopped coming to work because her disability had never been effectively accommodated by Respondent, and essentially each time she tried to work, she was subjected to a painful migraine attack. As a result of the repeated and severe migraine attacks, her health was suffering, she was becoming more and more susceptible to migraine attacks, and the attacks were more severe and lasting longer. It was the failure of Respondent to put in place an accommodation that would allow her to work without these very serious medical consequences, that caused her to miss work and ultimately
 
 *391
 
 stop coming to work. The "reasonable efforts" that Respondent should have engaged in to "avoid separation" would have been to implement an effective accommodation, which officials of Respondent refused to do right from the beginning of the accommodation process. To say, as the Decision does, that sending Ms. Rittelmeyer letters demanding that she report to work, where she knew she would again be subjected to long lasting, painful migraine
 
 *362
 
 attacks triggered by the lights, constituted "reasonable efforts", is the height of sophistry.
 

 (Footnote omitted.) Thus, petitioner claims that respondent failed to make "reasonable efforts" to accommodate her disability, and due to that failure, she should prevail on this issue.
 

 42 U.S.C.A. § 12111
 
 (9) defines reasonable accommodation:
 

 The term "reasonable accommodation" may include-
 

 (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
 

 (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.
 

 42 U.S.C.A. § 12111
 
 (9) (West 2013).
 

 42 U.S.C.A. 12112 defines discrimination as
 

 not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.
 

 42 U.S.C.A. § 12112
 
 (b)(5)(A) (West 2013).
 

 Petitioner's main argument is that although respondent did make modifications to her work area to accommodate her disability, those modifications were not effective-because they did not work-so therefore they were not "reasonable" accommodations as a matter of law. In other words, respondent argues that the only accommodations that qualify as "reasonable" are those that would have been effective in eliminating her migraines at work. Petitioner relies primarily upon
 
 US Airways, Inc. v. Barnett
 
 ,
 
 535 U.S. 391
 
 ,
 
 122 S.Ct. 1516
 
 ,
 
 152 L.Ed.2d 589
 
 (2002), contending that "[a]s recognized by the Supreme Court in
 
 US Airways, Inc. v. Barnett
 
 ,
 
 535 U.S. 391
 
 , 400 [
 
 122 S.Ct. 1516
 
 ,
 
 152 L.Ed.2d 589
 
 ] (2002), 'An
 
 ineffective
 
 "modification" or "adjustment" will not
 
 accommodate
 
 a disabled individual's limitations.'
 

 *363
 
 (emphasis in original). Ineffective accommodations therefore are not accommodations." Petitioner's argument quotes
 
 US Airways, Inc. v. Barnett
 
 , out of context; in fact, the Supreme Court specifically
 
 rejected
 
 the idea that a "reasonable accommodation" and an "effective accommodation" are one and the same:
 

 Barnett argues that the statutory words "reasonable accommodation" mean only "effective accommodation," authorizing a court to consider the requested accommodation's ability to meet an individual's disability-related needs, and nothing more. ...
 

 ....
 

 These arguments do not persuade us that Barnett's legal interpretation of "reasonable" is correct. For one thing, in ordinary English the word "reasonable" does not mean "effective." It is the word "accommodation," not the word "reasonable," that conveys the need for effectiveness. An ineffective "modification" or "adjustment" will not accommodate a disabled individual's limitations. Nor does an ordinary English meaning of the term "reasonable accommodation" make of it a simple, redundant mirror image of the term "undue hardship." The statute refers to an "undue hardship on the operation of the business."
 
 42 U.S.C. § 12112
 
 (b)(5)(A).
 
 Yet a demand for an effective accommodation could prove unreasonable because of its impact, not on business operations, but on fellow employees
 
 -say, because it will lead to dismissals,
 
 *392
 
 relocations, or modification of employee benefits to which an employer, looking at the matter from the perspective of the business itself, may be relatively indifferent.
 

 Neither does the statute's primary purpose require Barnett's special reading. The statute seeks to diminish or to eliminate the stereotypical thought processes, the thoughtless actions, and the hostile reactions that far too often bar those with disabilities from participating fully in the Nation's life, including the workplace.
 
 See generally
 
 §§ 12101(a) and (b). These objectives demand unprejudiced thought and reasonable responsive reaction on the part of employers and fellow workers alike. They will sometimes require affirmative conduct to promote entry of disabled people into the work force.
 
 See
 

 supra
 
 , at 397-98,
 
 122 S.Ct. 1516
 
 .
 

 *364
 

 They do not, however, demand action beyond the realm of the reasonable.
 

 Neither has Congress indicated in the statute, or elsewhere, that the word "reasonable" means no more than "effective." The EEOC regulations do say that reasonable accommodations "enable" a person with a disability to perform the essential functions of a task. But that phrasing simply emphasizes the statutory provision's basic objective. The regulations do not say that "enable" and "reasonable" mean the same thing. And as discussed below, no court of appeals has so read them. But see
 
 Barnett v. United States Air, Inc.,
 

 228 F.3d 1105
 
 , 1122-1123 (9th Cir. 2000) (Gould, J., concurring).
 

 Finally, an ordinary language interpretation of the word "reasonable" does not create the "burden of proof" dilemma to which Barnett points. Many of the lower courts, while rejecting both U.S. Airways' and Barnett's more absolute views, have reconciled the phrases "reasonable accommodation" and "undue hardship" in a practical way.
 

 They have held that a plaintiff/employee (to defeat a defendant/employer's motion for summary judgment) need only show that an "accommodation" seems reasonable on its face,
 
 i.e.
 
 , ordinarily or in the run of cases.
 
 See, e.g.
 
 ,
 
 Reed v. LePage Bakeries, Inc.
 
 ,
 
 244 F.3d 254
 
 , 259 (CA1 2001) (plaintiff meets burden on reasonableness by showing that, "at least on the face of things," the accommodation will be feasible for the employer);
 
 Borkowski v. Valley Central School Dist.
 
 ,
 
 63 F.3d 131
 
 , 138 (CA2 1995) (plaintiff satisfies "burden of production" by showing "plausible accommodation");
 
 Barth v. Gelb
 
 ,
 
 2 F.3d 1180
 
 , 1187 (CADC 1993) (interpreting parallel language in Rehabilitation Act, stating that plaintiff need only show he seeks a "method of accommodation that is reasonable in the run of cases" (emphasis in original)).
 

 Once the plaintiff has made this showing, the defendant/employer then must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances.
 
 See
 

 Reed,
 
 supra
 

 , at 258 (" 'undue hardship inquiry focuses on the hardships imposed ... in the context of the particular [employer's] operations' ")
 

 *365
 
 (
 
 quoting
 

 Barth,
 
 supra
 

 , at 1187 );
 
 Borkowski,
 
 supra
 

 , at 138 (after plaintiff makes initial showing, burden falls on employer to show that particular accommodation "would cause it to suffer an undue hardship");
 
 Barth,
 
 supra
 

 , at 1187 ("undue hardship inquiry focuses on the hardships imposed ... in the context of the particular agency's operations").
 

 Not every court has used the same language, but their results are functionally similar. In our opinion, that practical view of the statute, applied consistently with ordinary summary judgment principles, see Fed. Rule Civ. Proc. 56, avoids Barnett's burden of proof dilemma, while reconciling the two statutory phrases ("reasonable accommodation" and "undue hardship").
 

 535 U.S. 391
 
 , 399-402,
 
 122 S.Ct. 1516
 
 , 1521-23,
 
 152 L.Ed.2d 589
 
 , 601-03 (emphasis added). Thus, we reject petitioner's contention that because the accommodations were not effective for her, they were
 
 per se
 
 not reasonable.
 
 See
 
 id.
 

 Under
 
 Barnett
 
 , an "ineffective modification" is one which "will not accommodate a disabled individual's limitations."
 
 See
 

 id.
 

 at 400
 
 ,
 
 122 S.Ct. at 1522
 
 ,
 
 152 L.Ed.2d at 601
 
 .
 

 *393
 
 The most obvious modification to accommodate light sensitivity is to eliminate an employee's exposure to lights, if possible, and otherwise to reduce exposure to light as much as possible without excessive interference with the ability of other employees to do their work.
 

 The determination of reasonableness is
 

 an objective analysis, not a subjective one dominated by either party's concerns. In assessing objective reasonableness, the governing statute provides guidance. See
 
 42 U.S.C. § 12111
 
 (9). It provides that reasonable accommodation' may include a number of listed measures; obviously Congress considered these types of accommodations to be reasonable.
 

 Williams v. Channel Master Satellite Systems, Inc.
 
 ,
 
 101 F.3d 346
 
 , 350 (4th Cir. 1996) (quotation marks omitted).
 

 Respondent tried many of the listed measures in
 
 42 U.S.C.A. § 12111
 
 (9).
 
 See
 

 42 U.S.C.A. § 12111
 
 (9). For example, respondent offered "job restructuring" by proposing that petitioner work from home; she rejected this proposal more than once. Respondent also "modif[ied] ... equipment or devices" by making many changes to petitioner's cubicle
 
 *366
 
 and to lights throughout the work area. The modifications were objectively reasonable in that they lessened petitioner's exposure to light, while allowing other employees adequate light to work. Over the course of several months respondent made many accommodations, including some based on petitioner's own requests for changes which she believed would accommodate her needs, and others identified by respondent. The accommodations included turning off various sets of lights, light bulb watt changes, disabling lights, several modifications to petitioner's cubicle, and movement of shared office equipment to petitioner so she would not need to leave her cubicle. At the same time, respondent also had to address complaints of other employees who were having difficulty seeing in the darkened areas of the workplace. Respondent was also trying to hit a moving target, since petitioner's light sensitivity increased over time.
 
 [5]
 
 Even petitioner admitted that after the modification, her cubicle was darker than it had ever been yet she began requesting accommodations for light sources that had not previously been a problem, such as Ms. Sikes's office. Furthermore, petitioner rejected requests to work from home and the option of wearing room-darkening glasses, although she admitted that she used them elsewhere. Given the binding findings of fact,
 
 see generally
 

 Garrett
 
 ,
 
 224 N.C.App. at 34
 
 ,
 
 735 S.E.2d at 416
 
 , it is clear that respondent made numerous reasonable accommodations.
 

 D. Undue Hardship
 

 Petitioner further contends that
 

 where an employer has informally accommodated an employee's disability, and the employee performs their job satisfactorily, that establishes that the accommodation is reasonable and if the employer revokes that accommodation, they must prove that continuation of the accommodation would cause it undue hardship[, and] morale issues of other employees do not constitute undue hardship to the employer, where the evidence shows that the work of the employees was getting completely done[.]
 

 *367
 
 (Quotation marks omitted.) Again, petitioner is incorrect in her legal analysis. In a related issue, the Fourth Circuit clarified that
 

 [t]he fact that certain accommodations may have been offered by the County to
 

 *394
 

 some employees as a matter of good faith does not mean that they must be extended to Myers as a matter of law. See
 

 Traynor v. Turnage
 
 ,
 
 485 U.S. 535
 
 , 549,
 
 108 S.Ct. 1372
 
 , 1384,
 
 99 L.Ed.2d 618
 
 (1988) ("There is nothing in the Rehabilitation Act that requires that any benefit extended to one category of handicapped persons also be extended to all other categories of handicapped persons."). Moreover, such a regime would discourage employers from treating disabled employees in a spirit that exceeds the mandates of federal law. If an employer undertook extraordinary treatment in one case, the same level of accommodation would be legally required of it in all subsequent cases; in other words, a good deed would effectively ratchet up liability, and thus not go unpunished.
 
 See
 

 Vande Zande v. Wisconsin Dep't of Admin.
 
 ,
 
 44 F.3d 538
 
 , 545 (7th Cir. 1995). Discouraging discretionary accommodations would undermine Congress' stated purpose of eradicating discrimination against disabled persons.
 
 See
 

 42 U.S.C. § 12101
 
 (b). Accordingly, we do not accept the proposition that Myers is ipso facto entitled to the precise accommodations afforded other disabled County employees.
 

 Myers v. Hose
 
 ,
 
 50 F.3d 278
 
 , 284 (4th Cir. 1995) (emphasis added).
 

 While
 
 Myers
 
 was addressing different employees, the logic also applies here.
 
 Compare
 
 id.
 

 The fact that Ms. Sikes was willing to try certain accommodations does not mean she was then bound to continue an accommodation even if it ended up being untenable.
 
 See generally
 
 id.
 

 Ms. Sikes tried turning off all overhead florescent lights but she later determined that this accommodation could not continue due to other employees' complaints.
 
 See generally
 
 id.
 

 Petitioner's interpretation would do exactly what
 
 Myers
 
 warns about causing "a good deed [to] effectively ratchet up liability[;]" an employer should not be punished for being willing to try an accommodation which ends up not working or being discontinued for other reasons, whether due to the disabled employee, other employees, or the employer.
 

 Id.
 

 Again, reasonableness is an objective standard, and it is not objectively reasonable to require all other employees to work without overhead lights in this particular situation.
 
 See
 

 Williams
 
 ,
 
 101 F.3d at 350
 
 . U.S.C.A. § 12112(b)(5)(A)
 

 *368
 
 mandates that the employer must demonstrate undue hardship if refusing a
 
 reasonable
 
 accommodation, not an unreasonable accommodation proposed by the disabled employee.
 
 See
 
 U.S.C.A. § 12112(b)(5)(A). Therefore, we need not further address petitioner's arguments regarding undue hardship.
 

 E. Interactive Process
 

 Closely related to petitioner's challenge of the reasonableness of respondent's accommodations are her arguments that respondent failed to use good faith in engaging in the interactive process of finding a reasonable accommodation. Specifically, petitioner argues:
 

 6. Did the ALJ and the Superior Court Judge commit errors of law when they failed to recognize that under the ADA the employer must propose additional possible reasonable accommodations when it is aware that the accommodations[ ] it has implemented are not effective, and also when the employee proposes additional accommodations, and the failure to do so constitutes a failure to engage in the interactive process required by the ADA? COL 28, 29, 30, 36 & 37 [R. pp. 155-56],
 
 aff'd
 
 , R. p. 163]
 

 7. Did the ALJ and the Superior Court Judge commit errors of law when they failed to recognize the bad faith of Respondent in the interactive process as shown by numerous statements by managers indicating discriminatory intent, and the refusal to consider the reasonable accommodation of turning off the fluorescent lights? COL 28, 29, 30, 32, 36 & 37 [R. pp. 155-56],
 
 aff'd
 
 , R. p. 163.
 

 8. Did the ALJ and the Superior Court Judge commit errors of law when they failed to recognize that when the lack of an effective accommodation for a disabled employee causes the employee to have deficiencies in their work performance such as excessive absenteeism, under the ADA a discharge for those deficiencies is a discharge based on disability? COL 19, 20, 21,
 
 *395
 
 23, 24, 25, 36 & 37 [R. pp. 153-54 & 156],
 
 aff'd
 
 , R. p. 163.
 

 The parties were engaged in a formal interactive process to find a reasonable accommodation and both employee and employer are required to participate in good faith:
 

 Once an employee has made a request for an accommodation, the ADA's regulations state that "it may be necessary
 
 *369
 
 for the employer to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation" in order to craft a reasonable accommodation.
 
 29 C.F.R. § 1630.2
 
 (o)(3). The EEOC's interpretive guidelines reinforce this directive, but also stress that the interactive process requires the input of the employee as well as the employer.
 
 See
 
 29 C.F.R. Pt. 1630, App. § 1630.9 at 359 ("flexible, interactive process that involves both the employer and the qualified individual with a disability").
 
 See also
 

 Taylor v. Principal Financial Group, Inc.
 
 ,
 
 93 F.3d 155
 
 , 165 (5th Cir.),
 
 cert. denied
 
 ,
 
 519 U.S. 1029
 
 ,
 
 117 S.Ct. 586
 
 ,
 
 136 L.Ed.2d 515
 
 (1996) (duty to launch interactive process is triggered by request for an accommodation). The need for bilateral discussion arises because "each party holds information the other does not have or cannot easily obtain."
 
 See
 

 Taylor v. Phoenixville School Dist.
 
 ,
 
 174 F.3d 142
 
 , 162 (3rd Cir.1999) (noting that employers will not always understand what the disabled employee is capable of and the employee will not always understand what accommodations are reasonably available). Courts interpreting the interactive process requirement have held that when an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA.
 
 See
 

 Taylor v. Phoenixville School Dist.
 
 ,
 
 174 F.3d 142
 
 , 165 ;
 
 Bultemeyer v. Fort Wayne Community Schools
 
 ,
 
 100 F.3d 1281
 
 , 1285 (7th Cir.1996). However, recognizing that "the responsibility for fashioning a reasonable accommodation is shared between the employee and the employer,"
 
 see
 

 Principal Financial Group
 
 ,
 
 93 F.3d at 165
 
 (emphasis added), courts have held that
 
 an employer cannot be found to have violated the ADA when responsibility for the breakdown of the "informal, interactive process" is traceable to the employee and not the employer
 
 .
 
 See
 

 Beck v. University of Wisconsin Bd. Of Regents
 
 ,
 
 75 F.3d 1130
 
 , 1135 (7th Cir.1996) ;
 
 Templeton v. Neodata Services, Inc.
 
 ,
 
 162 F.3d 617
 
 (10th Cir.1998). This reasoning flows naturally from our recognition in
 
 Principal Financial Group
 
 that responsibility for the interactive process is shared. Since on the evidence here no reasonable jury could find Akzo at fault for the breakdown of the interactive process,
 
 *370
 
 the district court was correct to grant judgment as a matter of law in Akzo's favor.
 

 Loulseged v. Akzo Nobel Inc.
 
 ,
 
 178 F.3d 731
 
 , 735-36 (5th Cir. 1999) (emphasis added) (footnotes and brackets omitted).
 

 Petitioner's issues here are all based upon the "failure" of the ALJ and Superior Court to "recognize" certain things. While petitioner's issues are framed as legal issues they really ask this Court to re-weigh the evidence and make different factual determinations. But we have already determined that the findings of fact are binding upon this Court.
 
 See
 

 Garrett
 
 ,
 
 224 N.C.App. at 34
 
 ,
 
 735 S.E.2d at 416
 
 . Furthermore, to the extent that petitioner's issues regarding the ALJ's and Superior Court's "failures" are based upon a legal determination, petitioner's legal arguments also fail because the numerous findings of fact regarding the many reasonable accommodations made by respondent demonstrate that respondent engaged in the interactive process in good faith.
 

 The findings of fact also establish that it was petitioner who ended the interactive process. Thus, even generously assuming
 
 arguendo
 
 that respondent's arguments may raise some interesting legal points, the fact remains that petitioner's actions ultimately caused the interactive process to stop before finding an effective accommodation. Though petitioner argues that she disengaged from the process because she could no longer return to work without risking a migraine being triggered, this point
 
 ignores
 
 the evidence and findings that petitioner was given the opportunity to work from home as the interactive process continued. Petitioner chose not to work from home; petitioner chose not to
 
 *396
 
 return to work; petitioner's choices were the reason the interactive process failed to continue. "No matter how earnestly one party attempts to engage in an interactive process, its efforts can always be superficially characterized as unilateral if the other party refuses to interact. One cannot negotiate with a brick wall."
 
 Loulseged
 
 ,
 
 178 F.3d at 737
 
 . These arguments are overruled.
 

 F. Termination
 

 Petitioner's final subset of arguments run the gamut touching on "discrimination," "retaliation," and the failure of the ALJ and Superior Court to "adopt" her findings of fact and cited law and to award her damages. All of petitioner's arguments are based upon the premise that respondent failed to properly engage in the interactive process and failed to make reasonable accommodations, so ultimately respondent retaliated against petitioner by terminating her employment on the discriminatory basis of her disability. But petitioner was not terminated
 
 *371
 
 for her disability; she was terminated because she stopped coming to work without even letting respondent know that she would not report to work as scheduled, after she also repeatedly refused to work from home. Petitioner's arguments fail.
 

 V. Conclusion
 

 For the foregoing reasons, we affirm.
 

 AFFIRMED.
 

 Judges BRYANT and CALABRIA concur.
 

 [1]
 

 Petitioner notes in her statement of the facts in her brief that she has relied upon "Petitioner's
 
 Proposed
 
 Decision submitted at OAH, which is included in the Rule 11(c) Supplement[.]" (Emphasis added.) As discussed below, we deem petitioner's arguments regarding the findings of fact abandoned, and we have relied upon the ALJ's order.
 

 [2]
 

 We have used pseudonyms for the other employees to protect their privacy.
 

 [3]
 

 North Carolina Rule of Appellate Procedure 28(b)(2) requires that the brief set forth "[a] statement of the issues presented for review" and (6) requires "[a]n argument, to contain the contentions of the appellant with respect to each issue presented." N.C. App. P. R. 28. We must admit that Rule 28 does not specifically
 
 require
 
 that the issues be addressed in the same sequence in both portions of the brief, although that seems to be nearly the universal practice in briefs filed in this Court, but in this case our initial assumption that the numbered issues were intended to coincide directly with the lettered arguments was apparently wrong; it was simply a coincidence that there are 14 issues presented and 14 arguments.
 

 [4]
 

 There is a question of whether petitioner was qualified for the job, but because petitioner's claim fails if she does not meet any one of the three prongs for her claim, we choose to address only the third prong.
 
 See generally
 

 Johnson
 
 ,
 
 139 N.C.App. 676
 
 , 684-85,
 
 535 S.E.2d 357
 
 , 363.
 

 [5]
 

 One of petitioner's arguments is that her exposure to light in the workplace actually "aggravated" her light sensitivity, so that respondent's failure to find the right accommodation earlier in the process worsened her condition. Even if we assume this to be true, respondent had no way of knowing or predicting if petitioner's light sensitivity would increase, decrease, or stay the same based upon the modifications made. The only medical information on this increase in sensitivity was presented at the hearing; petitioner would not permit respondent to communicate with her healthcare providers during the interactive process. This additional information regarding petitioner's increasing sensitivity may have helped respondent do a better job of accommodating petitioner's condition, but petitioner chose not to share her medical information during the accommodation process.