IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA 19-476

 Filed: 21 July 2020

New Hanover County, Nos. 18-JA-153, 154

IN THE MATTERS OF: S.M.L., E.R.M.L, Minor Children

 Appeal by respondent from order entered 4 March 2019 by Judge J. H.

Corpening, II in District Court, New Hanover County. Heard in the Court of Appeals

18 February 2020.

 New Hanover County Department of Social Services, by Jill R. Cairo, for
 petitioner-appellee.

 Miller and Audino, LLP, by Jeffrey L. Miller, for appellant-mother.

 Administrative Office of the Courts, by Michelle FormyDuval Lynch, for
 appellee-guardian ad litem.

 STROUD, Judge.

 This appeal arises out of an Order on Adjudication of neglect and Initial

Disposition. Because there were not sufficient findings of fact to support the trial

court’s conclusion of neglect as to one of the juveniles, Ed,1 we reverse the

adjudication as to Ed and remand for further findings. The trial court’s findings of

fact as to the other juvenile, Sara, support its conclusion of law regarding her

adjudication as neglected. However, the trial court failed to comply with the

1 Pseudonyms are used to protect the identity of the juveniles.
 IN RE: S.M.L., E.R.M.L.

 Opinion of the Court

requirements of North Carolina General Statute § 7B-911 in terminating jurisdiction

of the juvenile court and transferring the case as a Chapter 50 matter because the

trial court failed to make findings of fact and conclusions of law regarding

modification of the existing Chapter 50 custody order and finding no need for

continued intervention by the juvenile court. In addition, the trial court failed to

enter a Chapter 50 order as directed in its rendition and mandated by the

Adjudication and Disposition order on appeal, so we must remand for entry of the

Chapter 50 order in accord with North Carolina General Statute § 7B-911.

Accordingly, with respect to Sara, we affirm in part, reverse in part, and remand for

further proceedings.

 I. Background

 Mother and Father were married in 2009 and separated in 2014. They are the

parents of Sara, born in 2008, and Ed, born in 2013. On 14 June 2016, Father

initiated a civil action under Chapter 50 against Mother seeking child custody. On

13 October 2016, the trial court entered a temporary child custody order granting

Mother primary physical custody of the two children. The trial court granted Father

visitation and required him to pay child support. On 17 March 2017, the trial court

entered a Consent Judgment and Order adopting the custody terms of the October

2016 temporary order with minor changes and adjudged Father in contempt for

 -2-
 IN RE: S.M.L., E.R.M.L.

 Opinion of the Court

nonpayment of child support. The Consent Order regarding custody was still in effect

when the petition was filed in this action.

 Since the trial court’s findings of fact are mostly unchallenged, we will quote

the portions of the facts pertinent to the issues on appeal as found by the trial court.

Finding of Fact 2 was based upon a written stipulation by the parties, while the

remaining findings were made by the trial court and were not stipulated:

 [2.] a. On or about March 2018, the Juvenile, [Sara],
 disclosed to Respondent-Mother that she was being
 sexually abused by [Joe], a man who had resided with the
 family for several years prior to the disclosure.[2]

 b. The Respondent-Mother immediately took [Sara] to the
 hospital and reported the allegations to medical and law
 enforcement officials.

 c. [Sara] was treated by medical professionals and made
 available to law enforcement.

 d. [Sara] had a CME (Child Medical Examination) at the
 Carousel Center on March 9, 2018, during which she again
 made consistent disclosures regarding the sexual abuse.
 During her interview, [Sara] was also able to illustrate her
 disclosure by drawing a penis with “white stuff coming out
 of it.”

 e. [Joe] has not been charged with any criminal conduct.

 f. Respondent-Mother has had a difficult time adjusting to
 the fact that her significant other was responsible for
 sexually assaulting her daughter. However, for purposes of
 this action, the parties stipulate and agree that [Sara] was
 sexually assaulted by [Joe], on or before February 2018,

2 We have used a pseudonym for Mother’s boyfriend who sexually abused Sara, to protect the identity
of the minor children.

 -3-
 IN RE: S.M.L., E.R.M.L.

 Opinion of the Court

and any allegations she has made to law enforcement or
medical professionals regarding her assault shall be
deemed admissible and credible at the trial of this matter.

3. At the time [Sara] disclosed the sexual abuse to
Respondent-Mother, and before taking her to seek medical
attention, Respondent-Mother drove [Sara] to [Joe]’s place
of employment to confront him about the allegations.

4. In her CME on March 9, 2018, [Sara] disclosed that on
more than one occasion, [Joe] had her touch his genitals
with her hand and also touched her genitals with his hand.
This touching was skin-to-skin contact, but [Sara] denied
that there was vaginal or anal penetration.

5. [Sara] disclosed that the sexual abuse would usually
happen at night, at times when her mother was not present
in the residence.

6. A. copy of the CME Report for [Sara] for March 9, 2018
was admitted into evidence without objection and pursuant
to the stipulation of the parties and is incorporated by
reference as if fully set forth herein.

7. [Sara] disclosed to Helen DePuy, Family Preservation
and Reunification Specialist with Methodist Home for
Children, that the sexual abuse began when she was six
years old. She described that it was very confusing to her,
because [Joe] would be nice to her otherwise.

8. Neither Respondent-Parent was aware of the sexual
abuse of [Sara] by [Joe] prior to [Sara] making the
disclosure in March 2018.

9. From March 29, 2018 to April 5, 2018, both Juveniles
were placed with the Respondent-Father. They were
allowed to move back to Respondent-Mother’s residence
upon assurance that the Juveniles would have no contact
with [Joe].

 -4-
 IN RE: S.M.L., E.R.M.L.

 Opinion of the Court

10. Respondent-Mother and the Juveniles remained in the
same residence throughout the CPS investigation. This
residence is owned by [Joe]’s brother and was being rented
jointly by Respondent-Mother and [Joe].

11. As the Child Protective Services (CPS) investigation
continued, Respondent-Mother continued to have contact
with [Joe]. As of May 30, 2018, Respondent-Mother
reported that she still talked to [Joe] because she was
worried about him as he had been sleeping in his car and
has a seizure disorder. At that time, she denied that he had
been to her home or had contact with the Juveniles.

12. Both [Sara] and Respondent-Mother were referred for
therapy services. In her sessions, Respondent-Mother
continued to express doubt about the sexual abuse
allegations, often actively seeking to discredit [Sara] and
the details of her account.

13. The family was referred to Helen DePuy, a Family
Preservation and Reunification Specialist with Methodist
Home for Children. The first session was held on June 5,
2018. The goals of this intervention were to support [Sara]
and help Respondent-Mother come to terms with what had
happened. The plan for services included in-home family
sessions twice per week and individual sessions for
Respondent-Mother as well as joint sessions with one or
both Juveniles for a six- to eight-week period. [Sara] was
ultimately transitioned into Cognitive Behavioral Therapy
which lasted until November 2018.

14. Ms. DePuy provided counseling and psychosocial
education to Respondent-Mother to educate her regarding
various aspects of sexual abuse, including the disclosure
process of sexual assault victims as Respondent-Mother
continued to question why, if the allegations were true,
[Sara] waited so long to disclose. Respondent-Mother
expressed the belief that [Sara] was manipulating the
family to “get rid of” [Joe] in hopes that the Respondent-
Parents would reunite. Respondent-Mother compared her

 -5-
 IN RE: S.M.L., E.R.M.L.

 Opinion of the Court

own sexual activities with [Joe] to [Sara]’s account in
attempting to discredit the allegations. Respondent-
Mother stated that [Joe] was the first man who made her
happy and was not abusive or aggressive towards her,
asserting that she has “a right to be happy.” Respondent-
Mother was confronted about having put pictures of herself
and [Joe] back on the walls in the residence where she and
the Juveniles continued to reside; she responded that those
were her happy times, and she did not want to not have
them up because of the happy memories they represented,
evidencing a complete lack of insight as to how this would
affect [Sara]. Respondent-Mother expressed that she felt
it was unfair to ask her to take the pictures down, but
agreed to do so, only if she could place them on her bedside
table. In counseling with [Sara], the Juvenile was very
upset about these pictures continuing to be displayed in the
household, saying that nobody believed her (about the
allegations) and that her mother did not care.

15. On June 14, 2018, police responded to Respondent-
Mother’s home to do a welfare check of the Juveniles at the
request of Respondent-Father who was standing by down
[sic] the street with law enforcement. Misti Campbell,
Social Worker with the Department, was summoned to the
scene at approximately 10:30 p.m.

16. Upon her arrival, Social Worker Campbell learned that
law enforcement had located [Joe] inside the home and
asked him to leave. Respondent-Mother had initially
denied that he was present within the residence, but he
was discovered in her bedroom playing video games when
law enforcement searched the premises with Respondent-
Mother’s consent.

17. Social Worker Campbell attempted to interview
Respondent-Mother on scene, but Respondent-Mother
refused to answer questions as to when [Joe] had arrived
at the residence. When confronted by Social Worker
Campbell about the prohibition of [Joe] being present in
the residence, Respondent-Mother refused to directly

 -6-
 IN RE: S.M.L., E.R.M.L.

 Opinion of the Court

 answer the questions, but stated “but he isn’t around the
 kids” and went on to say that she did not feel the
 allegations of sexual abuse were true. At no time did
 Respondent-Mother claim that [Joe] had broken into her
 residence,[3] that she did not know he was in the residence,
 or that she was surprised law enforcement found him
 there; she made no inquiry about pressing criminal charges
 against [Joe] related to him being in the home that night
 or at any other time.

 18. Social Worker Campbell advised that the Juveniles
 were being removed from the home to go stay with
 Respondent-Father as a result of [Joe] being found in the
 residence and asked Respondent-Mother to wake them and
 gather their belongings. Respondent-Mother agreed but
 punched the front windows of the home as she went inside.
 She woke the Juveniles up but did not gather any of their
 belongings and sent them outside without shoes on. The
 Juveniles were initially upset and crying but as soon as
 they saw Respondent-Father, they immediately stopped
 crying and were fine.

 19. Social Worker Campbell again attempted to interview
 Respondent-Mother and complete a Safety Assessment . . .
 but Respondent-Mother refused.[4]

 20. Social Worker Lindsay Hayden followed up with
 Respondent-Mother on June 18, 2018 about [Joe] having
 been found in her residence. During that interview,
 Respondent-Mother said that [Joe] had since left for
 California, as him leaving was the only thing that would
 separate their love for one another. Social Worker Hayden
 questioned Respondent-Mother as to why the sexual abuse
 allegations had not been sufficient reason to separate from
 him, and Respondent Mother replied that “the details don’t
 add up” referring to [Sara]’s disclosure. When specifically

3 Respondent Mother later made some of these claims to her counselor and others in her testimony at
the hearing.

4 We have omitted the portion of this finding not supported by the record, as discussed below.

 -7-
 IN RE: S.M.L., E.R.M.L.

 Opinion of the Court

discussing [Joe] being found inside the residence days
earlier, Respondent-Mother indicated that he would come
over and stay in the bedroom on the opposite side of the
residence from the children’s bedrooms, saying she could
lock the hallway door that led to that bedroom.
Respondent-Mother again stated that [Joe] was now in
California, but that if he could not get a job, he would go to
Kentucky where he was originally from. Respondent-
Mother questioned Social Worker Hayden about the
ramifications for the CPS case if she were to marry [Joe].

21. Contrary to what Respondent-Mother said to Social
Worker Hayden, she told Helen DePuy in a subsequent
counseling session that [Joe] had been coming into her
home without her knowledge, saying she did not know he
was there because she sleeps on the couch in her work
clothes so she did not have any reason to go back to the
bedroom. Ms. DePuy was “very, very” concerned that [Joe]
had been located back in the residence, particularly when
the Juveniles were present.

22. [Sara] related to Ms. DePuy her belief that [Joe] had
been coming to her mother’s residence regularly prior to
the June 14, 2018 incident.

23. In subsequent counseling sessions, Respondent-Mother
wavered between disbelief of [Sara]’s account of the sexual
abuse, believing that “something” happened to [Sara]
without acknowledging [Joe]’s culpability, and saying that
she does believe [Sara]. At times, she complains of [Sara]
not listening or being disrespectful towards her but seems
unable to comprehend that this could be symptomatic of
her having been sexually abused, particularly in
conjunction with Respondent-Mother’s stated disbelief of
the allegations. Ms. DePuy stated that Respondent-
Mother’s disbelief impeded [Sara]’s recovery; [Sara]’s
“trauma narrative” she wrote as part of her Cognitive
Behavioral Therapy included references to Respondent-
Mother’s disbelief.

 -8-
 IN RE: S.M.L., E.R.M.L.

 Opinion of the Court

24. By contrast, Ms. DePuy observed Respondent-Father to
be fully and appropriately supportive of [Sara]’s therapy.
He was always present, not missing a single session,
verbalized his belief in [Sara]’s account and made her feel
safe and protected.

25. Subsequent to the June 14, 2018 incident and the June
18, 2018 follow up interview with Social Worker Hayden,
Respondent-Mother continued to remain in contact with
[Joe], such that she reported that he had gone from
California to Kentucky. In early July 2018, Social Worker
Hayden had local law enforcement confirm that [Joe] was
staying at his father’s residence in Covington, Kentucky.

26. By July 23, 2018, Social Worker Hayden learned that
[Joe] had returned to Wilmington and was able to make
telephone contact through his employer, Booth Brothers.

27. When confronted on July 24, 2018, about [Joe] being
back in Wilmington, Respondent-Mother acknowledged
that she already knew he was back in town and was aware
of where he was staying and working. During this
conversation, Respondent-Mother again questioned the
lack of physical evidence to substantiate the sexual abuse
allegations and would only say “something happened to
[Sara].” When Social Worker Hayden pressed her to
acknowledge that “[Joe] did something to [Sara],”
Respondent-Mother only repeated “something happened to
[Sara].” When Social Worker Hayden asked Respondent-
Mother point blank whether she believed [Sara], she again
stated only that “something happened to [Sara].”

28. On August 10, 2018, during a walk-through inspection
of Respondent-Mother’s residence, Social Worker Hayden
observed a dresser in the hallway outside of the master
bedroom that was full of [Joe]’s clothing as well as drug
paraphernalia and other items that Respondent-Mother
indicated belonged to [Joe].

 -9-
 IN RE: S.M.L., E.R.M.L.

 Opinion of the Court

 After the New Hanover County Department of Social Services (“DSS”) and

Father discovered Joe was continuing to come to Mother’s residence in June and July,

DSS recommended that Father file a motion in the existing Chapter 50 custody case

seeking modification of custody. “On or about July 30, 2018, Respondent-Father

attempted to modify the existing custody order, which had granted primary physical

custody of both Juveniles to Respondent-Mother, but his motion for ex parte relief was

denied when the Court realized the Department of Social Services was involved.”

Thus, on 13 August 2018, DSS filed the petition alleging the juveniles were neglected.

 The trial court also made the following findings and conclusions relevant to the

issues on appeal:

 29. It is relevant to the Court’s determination that the
 Juvenile, [Ed], when residing with Respondent-Mother,
 lived in a home where another child was abused and/or
 neglected by a person who regularly lived in the home.

 30. The Juveniles . . . are neglected Juveniles as that term
 is defined by N.C.G.S. § 7B-101(15), in that they do not
 receive proper care, supervision or discipline from the
 Respondent-Mother and lived in an environment injurious
 to their welfare, as detailed in Findings of Fact 2 through
 29 above.

 31. [Sara] has remained in placement with Respondent-
 Father since June 14, 2018, and [Ed] has been placed with
 him since August 13, 2018. Respondent-Father has
 followed all recommendations of the Department as to the
 Juveniles’ care, and no concerns are noted.

 ....

 - 10 -
 IN RE: S.M.L., E.R.M.L.

 Opinion of the Court

 33. Helen DePuy discharged [Sara] from therapeutic
 services on November 8, 2018, with no recommendation for
 ongoing services. Ms. DePuy did counsel Respondent-
 Father on possible symptoms that could arise in the future.

 34. [Ed] is in daycare and is a healthy, happy five-year-old.
 He is up-to-date on well-child checks with no ongoing
 health concerns. He is being considered for a referral to
 speech therapy services.

 35. Respondent-Mother has been visiting with both
 Juveniles. She insisted on having visits with [Sara] despite
 the same not being therapeutically recommended
 previously by Ms. DePuy. During the visits, Respondent-
 Mother struggles to respond appropriately to [Sara],
 becoming defensive when [Sara] attempts to address issues
 with her. Respondent-Mother is able to interact well with
 [Ed] during visits, drawing or playing together with him.

 36. Respondent-Mother has refused to sign releases for the
 Department or the Guardian ad Litem such that no
 information is available as to her compliance or lack
 thereof with recommended services nor did Respondent-
 Mother present direct evidence as to her compliance.

 An Order for Nonsecure Custody was entered on 13 August 2018 granting DSS

custody and placement authority. The trial court held a hearing regarding

adjudication and disposition on 28 November and 6 December 2018. On 4 March

2019, the court entered an Order on Adjudication and Initial Disposition. Both

juveniles were adjudicated to be neglected, and the Father was granted legal custody

of the children. The trial court also ordered as follows:

 6. Attorney Jennings shall prepare an Order reflective of
 the findings, conclusions and decretal set forth therein, and
 the same shall be filed in the existing Chapter 50 custody

 - 11 -
 IN RE: S.M.L., E.R.M.L.

 Opinion of the Court

 action between Respondent-Parents, to wit, New Hanover
 County Case Number 16 CVD 1965. All further hearings
 as may be necessary shall be conducted under that case file
 and shall occur in regular civil district court.

No order regarding the Chapter 50 action as directed by the trial court appears in our

record, and according to the briefs, this order was never entered.5 Mother timely

appealed the Adjudication Judgment and Disposition Order.

 II. Standard of Review

 “The role of this Court in reviewing a trial court’s adjudication of neglect and

abuse is to determine ‘(1) whether the findings of fact are supported by “clear and

convincing evidence,” and (2) whether the legal conclusions are supported by the

findings of fact[.]’” In re T.H.T., 185 N.C. App. 337, 343, 648 S.E.2d 519, 523 (2007)

(alteration in original) (quoting In re Gleisner, 141 N.C. App. 475, 480, 539 S.E.2d

362, 365 (2000)), aff’d as modified, 362 N.C. 446, 665 S.E.2d 54 (2008). “If such

evidence exists, the findings of the trial court are binding on appeal, even if the

evidence would support a finding to the contrary.” Id. (citing In re McCabe, 157 N.C.

App. 673, 679, 580 S.E.2d 69, 73 (2003)).

 In order for a child to be properly adjudicated as
 neglected, “this Court has consistently required that there
 be some physical, mental or emotional impairment of the
 juvenile or a substantial risk of such impairment as a
 consequence of the failure to provide proper care,
 supervision, or discipline.” “Whether a child is neglected is

5 We have no information as to why this order was not entered.

 - 12 -
 IN RE: S.M.L., E.R.M.L.

 Opinion of the Court

 a conclusion of law which must be supported by adequate
 findings of fact.”

In re R.L.G., 260 N.C. App. 70, 75, 816 S.E.2d 914, 918 (2018) (citation omitted).

 III. Findings of Fact

 We first note that Mother’s argument regarding the trial court’s conclusion of

law as to neglect mentions several findings of fact she claims are not supported by

the evidence, although she did not make a separate argument regarding the findings

of fact she claims were not supported by the evidence. As to the few findings

challenged within her other arguments, her primary contention is regarding the

wording of the finding more than its substance or a specific detail within the finding.

But since conclusions of law must be supported by findings of fact, we will first

address Mother’s challenges to the findings of fact. See Rittelmeyer v. Univ. of North

Carolina at Chapel Hill, 252 N.C. App. 340, 348-49, 799 S.E.2d 378, 384 (2017) (“Since

findings of fact are required to support conclusions of law, if the findings of fact were

not supported by substantial evidence, it would have been helpful for petitioner to

challenge those facts before addressing alleged errors of law. After all, if material

facts in the findings were not supported by the evidence, we might never need to reach

at least some of the arguments regarding errors of law.” (citations omitted)).

 Mother’s most detailed argument mentions Finding No. 19.

She contends that Finding of Fact 19 is not supported by “any evidence that Social

Worker Campbell attempted to interview Mother, or to complete a safety assessment,

 - 13 -
 IN RE: S.M.L., E.R.M.L.

 Opinion of the Court

once the juveniles left the scene, or that Mother refused such an assessment or

interview, on 14 June 2018.” Mother’s argument is that the Social Worker did not

attempt to interview her or do an assessment after the juveniles were removed from

her home. In support of this argument, her brief cites to the testimony of Social

Worker Campbell. Social Worker Campbell’s only involvement in the case was on the

evening of 14 June 2018, as Social Worker Hayden was the regularly assigned social

worker for the case at that time. Finding of Fact 19 states: “Social Worker Campbell

again attempted to interview Respondent-Mother and complete a Safety Assessment

once the juveniles had left the scene, but Respondent-Mother refused.” (Emphasis

added.). The Findings 15 through 18 address in detail the events of 14 June 2018,

when Social Worker Campbell went to investigate a report that Joe was at the home

in violation of a safety agreement “that [Mother] would not allow [Joe] around the

children.” Mother does not challenge Findings 15 through 18, which address her

admission that Joe had been at the home, her disbelief in Sara’s allegations of sexual

abuse, and her refusal to answer Social Worker Campbell’s questions. Mother’s only

argument is that the words “once the juveniles left the scene” are not accurate.

Mother is correct that Social Worker Campbell’s testimony was that she attempted

to talk to Mother before the children were removed, not after, although they were

talking outside the home, in the driveway, and not in the home with the children

present. Since Social Worker Campbell was not the regularly assigned social worker

 - 14 -
 IN RE: S.M.L., E.R.M.L.

 Opinion of the Court

for the case, the follow-up after 14 June was done by Social Worker Hayden several

days later. Thus, Mother is correct that the words “once the juveniles left the scene”

are not supported by clear and convincing evidence, but the rest of the finding is

supported by clear and convincing evidence. Even if we ignore these words of Finding

14, this minor omission has no effect on the details of the events of 14 June 2018 or

on the detailed findings regarding DSS’s follow-up after that day.

 Mother also challenges the first sentence of Finding 31 as unsupported by the

evidence:

 31. [Sara] has remained in placement with Respondent-
 Father since June 14, 2018, and [Ed] has been placed with
 him since August 13, 2018.

 She contends the evidence does not support the finding as to Ed’s “placement”

with Father in August. She notes that the Guardian ad Litem’s report states that

both children “have been in this placement [with Father] since mid-June.” Social

Worker Hayden also testified that both children were placed with Father as of “June

[when] [Joe] was found in the residence[.]” Mother is correct that the reports and

evidence show that both children had been residing with Father as of mid-June, but

Ed had not been officially placed, by court order, until August. The Petition was filed

on 13 August 2018 and on the same date, the trial court entered an Order for

Nonsecure Custody on 13 August 2018 which placed both children with Father. Sara

had been placed with Father in June under the existing safety plan, but Ed was not.

 - 15 -
 IN RE: S.M.L., E.R.M.L.

 Opinion of the Court

This Order found that DSS had made efforts to “prevent or eliminate the need” for

the placement by arranging a child medical evaluation for Sara and counseling for

Sara and Mother and by “encouraging Respondent-Father to seek a modification of

the existing custody order.” The Petition alleges Father had filed a motion to modify

the Chapter 50 custody order on 30 July 2018, but “his motion for ex parte relief was

denied when the Court realized the Department of Social Services was involved.”

Thus, DSS filed the Petition and obtained the Nonsecure Custody order. Therefore,

Finding 31 is supported by the evidence, since Ed was not officially “placed” with

Father until August 2018, although Ed had been residing with Father since June.

 Mother also challenges Finding of Fact 36 which states:

 36. Respondent-Mother has refused to sign releases for the
 Department or the Guardian Ad Litem such that no
 information is available as to her compliance or lack
 thereof with recommended services nor did Respondent-
 Mother present any direct evidence as to her compliance.

The Court Report by DSS was presented as evidence at the adjudication and

disposition hearing. The report states “[Mother] has refused to sign releases for the

Department or GAL to follow up with collateral contacts regarding any of her

services.” The Guardian ad Litem’s court report stated that Mother “was asked to

complete a CCA” and “[t]he release she signed for the Department was limited and

did not allow access to a copy of the CCA.” Mother had reported that she was

“diagnosed with anxiety and depression.” The Guardian ad Litem asked Mother “to

 - 16 -
 IN RE: S.M.L., E.R.M.L.

 Opinion of the Court

sign a release but the Guardian has been unable to reach her Therapist as of the

writing of this report [dated 6 December 2018].” Mother did not present any evidence

regarding her compliance with the recommended services at the hearing. Finding 36

is supported by clear and convincing evidence.

 Therefore, all of the challenged findings of fact, except for the words in Finding

19, discussed above, are supported by clear and convincing evidence.

 IV. Probability of Repetition of Neglect

 Mother contends that the trial court erred by concluding both children were

neglected because the trial court failed to make findings of a probability of a repetition

of neglect at the time of the adjudication hearing.6

 Mother argues the trial court failed to make any findings or conclusions

regarding a “probability of a repetition of the past neglect” or “whether any past

neglect had been adequately remedied, and whether Mother was able to adequately

care for her children and provide for their physical and economic needs” as of the time

of the hearing. She contends that Sara’s abuse occurred prior to March 2018, that

she promptly reported the abuse and sought evaluation and treatment for Sara, and

that she did not allow Joe in Sara’s “presence” after DSS requested that he not be in

the presence of the children. She contends she continued to ensure Sara was not in

6 We consider this argument as to the adjudication of Sara only because we must reverse the
adjudication of neglect regarding Ed because there were no findings of any neglect or substantial risk
of future abuse or neglect to Ed based upon the sexual abuse of Sara. See infra Part V.

 - 17 -
 IN RE: S.M.L., E.R.M.L.

 Opinion of the Court

his presence—even while acknowledging Joe came into the home—and she eventually

accepted Sara’s report of sexual abuse and supported her. By the time of the hearing,

in November 2018, she contends she had “accepted the allegations and ended her

relationship with [Joe].” She also notes that the children were removed from her

home in June “without a court order and despite an existing civil Order granting

Mother custody.” She also claims it is “unclear what services were being provided to

Mother other than counseling with Ms. Depuy and some visitation.” She contends

the trial court failed to “resolve conflicts in the key evidence” regarding her living

circumstances at the time of the adjudication hearing, her counseling, Ed’s bond with

her, Joe’s denials to Mother regarding Sara’s abuse, her “innocent explanation for the

hallway dresser with Joe’s old clothes,” and many other facts. She contends she

immediately sought help for Sara, supported her disclosure of abuse even if she had

difficulty accepting it at first, and denied Joe was even “in the presence of” the

children after March 2018, even though she admits she testified that Joe

“occasionally broke in” to the home and she “found him in the home without her

consent or invitation.”

 Mother’s arguments regarding the facts address mainly the trial court’s

determinations regarding credibility and weight of the evidence, which we cannot

review on appeal. In re C.J.H., 240 N.C. App. 489, 493, 772 S.E.2d 82, 86 (2015) (“It

is the duty of the trial judge to consider and weigh all of the competent evidence, and

 - 18 -
 IN RE: S.M.L., E.R.M.L.

 Opinion of the Court

to determine the credibility of the witnesses and the weight to be given their

testimony.” (quoting In re S.C.R., 198 N.C. App. 525, 531-32, 679 S.E.2d 905, 909

(2009)). As noted in the unchallenged findings of fact quoted above, Mother continued

to express disbelief of Sara’s revelation of sexual abuse up until the hearing, when

she stipulated “for purposes of this action,” it had occurred. She discredited Sara

during their counseling sessions, and her visits with Sara were also difficult due to

her disbelief. In fact, Mother’s continued disbelief was part of Sara’s “trauma

narrative.” Mother continued to express her love for Joe and her desire to marry him

for months. Mother argues she had “innocent explanations” for the presence of Joe’s

clothing and drug paraphernalia in her home, even as late as August, 7 and she

continued to come up with different explanations each time she was asked. She also

testified that she was sometimes unaware that Joe was in the house because “[w]hen

you’re upstairs, you can’t hear anything downstairs” and that she could not keep Joe

out of the house. At trial, after admitting Joe had been in the house several times

after March 2018, Mother was asked if she was “concerned that the man who had

7 More than two months after the children were removed from the home, a Social Worker found that
Mother’s master bedroom was still “full of [Joe]’s clothes as well as drug paraphernalia and other items
belonging to [Joe].” Her explanations for the continued presence of Joe’s clothing and belongings in
the home were nonsensical. She first claimed clothes are “expensive” so she did not get rid of them
because Joe may need them. But if he was not living in the home, he would not have access to the
clothing and thus would presumably need to buy new clothing to wear anyway, since his old clothing
was still in the home and inaccessible to him. Mother then claimed the dresser in which the clothing
was stored was “heavy” and she could not move it. She did not explain why she could not simply
remove the clothing from the heavy dresser and arrange for Joe to get it without coming to the home.
In fact, Mother was still residing in the home owned by Joe’s brother until just prior to the hearing.

 - 19 -
 IN RE: S.M.L., E.R.M.L.

 Opinion of the Court

sexually assaulted your daughter had access to your home without you knowing about

it?” She replied that “[Joe] would have had access no matter what,” even if she

changed the locks because he would break in. But she did not call the police when he

broke in because she did not need “more chaos and drama.” She argues that she had

moved away from the home owned by Joe’s brother. But she testified at the first day

of the hearing, on 28 November 2018, that she was in the process of finding a new

place to live and was staying with a friend and presented no evidence that she ever

actually found a new residence.

 Based on the findings of fact, the trial court did resolve the relevant issues

presented by the evidence. The trial court did not find Mother’s claims of ending her

relationship with Joe or her support for Sara’s report of sexual abuse to be credible.

There was no evidence upon which the trial court would have been able to find that

Mother had obtained a new residence where Joe would not have access “no matter

what,” as the only evidence was Mother had just begun looking for a new place to live.

But despite these findings of fact, Mother is correct that the trial court did not make

a specific finding regarding the “probability of repetition” of neglect.

 The Guardian ad Litem concedes the trial court did not address the probability

of repetition of neglect specifically but argues there was no need for the trial court to

make this finding. Normally, the issue of the probability of repetition of neglect arises

in termination of parental rights cases or in cases where there has been a prior

 - 20 -
 IN RE: S.M.L., E.R.M.L.

 Opinion of the Court

adjudication by the court. It is well-established when the court has made a prior

adjudication of neglect and the child has not lived with the parent for a period of time,

the prior neglect cannot be the sole ground for termination of parental rights unless

the court has determined there is a probability of repetition of the neglect if the child

were returned to the parent. See In re Brim, 139 N.C. App. 733, 742, 535 S.E.2d 367,

372 (2000) (“[A] prior adjudication of neglect may be admitted and considered by the

trial court in ruling upon a later petition to terminate parental rights on the ground

of neglect.” However, such prior adjudication, standing alone, will not suffice where

the natural parents have not had custody for a significant period prior to the

termination hearing. Therefore, the court must take into consideration “any evidence

of changed conditions in light of the evidence of prior neglect and the probability of a

repetition of neglect. The determinative factors must be the best interests of the child

and the fitness of the parent to care for the child at the time of the termination

proceeding.” (alteration in original) (citations omitted) (quoting In Re Ballard, 311

N.C. 708, 713-15, 319 S.E.2d 227, 231-32 (1984))). But the definition of neglect is the

same, whether for purposes of an adjudication or for termination of parental rights.

See N.C. Gen. Stat. § 7B-101(15).

 Here, the trial court concluded that Sara was neglected because she does not

“receive proper care, supervision, or discipline” and she “lived in an environment

injurious to [her] welfare.” The trial court’s conclusion of neglect by Mother was not

 - 21 -
 IN RE: S.M.L., E.R.M.L.

 Opinion of the Court

based simply on the findings of sexual abuse by Joe; Mother was not aware the abuse

was happening until March 2018, and she did act immediately to stop the sexual

abuse. The trial court’s conclusion of neglect based upon Sara’s emotional injury from

the failure to receive proper care and supervision and an injurious environment were

based upon the findings regarding what had happened after March 2018: Mother’s

failure to support Sara, her prioritizing her relationship with Joe before Sara’s

welfare, her efforts to discredit Sara in therapy sessions, and her apparent inability

to keep Joe out of her home. Mother continued to live in the home owned by Joe’s

brother until the time of the adjudication hearing, despite her claim that Joe kept

breaking into the home and showing up in the home without her even hearing him.

Mother simply had not demonstrated her willingness or ability to ensure that Sara

was protected from Joe, even after repeated warnings from DSS. The trial court’s

findings of fact and conclusion of neglect properly consider Mother’s circumstances

and ability to care for Sara at the time of the adjudication and were based upon the

“physical, mental or emotional impairment of the juvenile or a substantial risk of

such impairment as a consequence of the failure to provide proper care, supervision,

or discipline.” In re R.L.G., 260 N.C. App. 70, 75, 816 S.E.2d 914, 918 (2018) (quoting

In re Safriet, 112 N.C. App. 747, 752, 436 S.E.2d 898, 901-02 (1993)).

 V. Adjudication of Neglect as to Ed

 - 22 -
 IN RE: S.M.L., E.R.M.L.

 Opinion of the Court

 Mother contends that the trial court’s findings of fact were not sufficient to

support its conclusion of law adjudicating Ed as a neglected juvenile. We agree.

 A neglected juvenile is one “whose parent, guardian, custodian, or caretaker

does not provide proper care, supervision, or discipline; or who has been abandoned;

or who is not provided necessary medical care; or who is not provided necessary

remedial care; or who lives in an environment injurious to the juvenile’s welfare[.]”

N.C. Gen. Stat. § 7B-101(15) (2019). In determining whether a juvenile is neglected,

“it is relevant that juvenile lives in a home . . . where another juvenile has been

subjected to abuse or neglect by an adult who regularly lives in the home.” Id. The

decision of the trial court regarding whether the other children in the home are

neglected, “must of necessity be predictive in nature, as the trial court must assess

whether there is a substantial risk of future abuse or neglect of a child based on the

historical facts of the case.” In re McLean, 135 N.C. App. 387, 396, 521 S.E.2d 121,

127 (1999).

 If the trial court relies on instances of past abuse or neglect of other children

in adjudicating a child neglected, the court is required to find “the presence of other

factors to suggest that the neglect or abuse will be repeated.” In re J.C.B., 233 N.C.

App. 641, 644, 757 S.E.2d 487, 489 (2014). “[W]hile this language regarding neglect

of other children ‘does not mandate’ a conclusion of neglect, the trial judge has

‘discretion in determining the weight to be given such evidence.’” In re P.M., 169 N.C.

 - 23 -
 IN RE: S.M.L., E.R.M.L.

 Opinion of the Court

App. 423, 427, 610 S.E.2d 403, 406 (2005) (quoting In re Nicholson, 114 N.C. App.

423, 427, 610 S.E.2d 852, 854 (1994)). “Section 7B-101(15) affords ‘the trial court

some discretion in determining whether children are at risk for a particular kind of

harm given their age and the environment in which they reside.’” In re C.M., 183

N.C. App. 207, 210, 644 S.E.2d 588, 592 (2007) (quoting In re McLean, 135 N.C. App.

387, 395, 521 S.E.2d 121, 126 (1999)).

 Here, the trial court’s findings focused almost exclusively on Sara, as a result

of the sexual abuse by Joe, and the trial court relied on instances of Sara’s past abuse

to adjudicate Ed neglected. Only two findings address Ed specifically, Findings of

Fact 29 and 34. The findings do not address any impact of Sara’s abuse on Ed but

instead find only that he “is a healthy, happy five-year-old” with “no ongoing health

concerns.” The only findings of abuse of Sara were sexual abuse by Joe. There are

no findings that this abuse had any effect on Ed, or that there was any reason to

believe Joe may abuse Ed in the future. In this regard, this case is quite similar to

In re J.C.B., where the trial court found the respondent-father had sexually abused

one of the juveniles in the home, although there were no allegations of abuse of the

other children:

 Even if we assume arguendo that respondent-father
 abused R.R.N., a juvenile, in the home where J.C.B.,
 C.R.R., H.F.R., and respondent-father lived, this fact alone
 does not support a conclusion that J.C.B., C.R.R., and
 H.F.R. were neglected. The trial court made virtually no
 findings of fact regarding J.C.B., C.R.R., or H.F.R., and

 - 24 -
 IN RE: S.M.L., E.R.M.L.

 Opinion of the Court

 wholly failed to make any finding of fact that J.C.B.,
 C.R.R., and H.F.R. were either abused themselves or were
 aware of respondent-father’s inappropriate relationship
 with R.R.N. Additionally, the trial court failed to make any
 findings of fact regarding other factors that would support
 a conclusion that the abuse would be repeated. As a result,
 the findings of fact do not support a conclusion that
 respondent-father’s conduct created a “substantial risk”
 that abuse or neglect of J.C.B., C.R.R., and H.F.R. might
 occur.

233 N.C. App. at 644–45, 757 S.E.2d at 489–90 (citation omitted).

 Here, as in In re J.C.B., the trial court did not make any finding even of any

risk of physical, mental or emotional impairment to Ed or the presence of other factors

supporting a conclusion that he was neglected. The only specific finding regarding

Ed is that he is happy, healthy, and has no “health concerns.” Thus, the trial court’s

findings of fact do not support its conclusion of law regarding adjudication of neglect

regarding Ed.

 Based upon our review of the record, there is evidence which could support

additional findings addressing the potential risk to Ed based upon Sara’s neglect,

such as Respondent-Mother’s continued refusal to believe Sara was abused and

repeated misrepresentations regarding Joe’s continuing presence in the home in

violation of the safety plan. But this Court cannot make the findings of fact, as only

the trial court has the discretion to make findings. See In re H.D.H., ___ N.C. App.

___, ___, 839 S.E.2d 65, 67 (2020).

 On remand, the trial court shall make findings addressing the relevance of the

 - 25 -
 IN RE: S.M.L., E.R.M.L.

 Opinion of the Court

sexual abuse of Sara and the effect of Mother’s neglect upon Ed, if the trial court

deems the evidence sufficient to support such findings. In its discretion, the trial

court may hold an additional hearing and consider additional evidence regarding the

allegation of neglect as to Ed.

 VI. Transfer of Jurisdiction under North Carolina General Statute § 7B-911

 Mother contends that the trial court’s order “fails to meet the requirements of

N.C. Gen. Stat. §7B-201 and §7B-911.” She contends the order fails to make the

required findings and conclusions to terminate the jurisdiction of the juvenile court

and to transfer jurisdiction to civil district court. We review an order’s compliance

with statutory requirements de novo. In re. J.K., 253 N.C. App. 57, 63, 799 S.E.2d

439, 443 (2017).

 We first note that the trial court intended and directed that two orders be

prepared and entered based upon the hearing. The trial court instructed counsel as

follows at the close of the hearing:

 So, Ms. Cairo, I’m going to ask you to draw that
 order. I’m going to convert this to Chapter 50. And so, Ms.
 Jennings, I'll ask you to draw the custody order out of this
 pursuant to 7B 911.
 MS. JENNINGS: Okay.
 THE COURT: With appropriate findings. Since
 custody’s being granted to a parent, we don’t have to have
 the case open for any period of time. And -- and by
 operational law, this order will actually resolve the
 pending motion in the open Chapter 50 case.

 - 26 -
 IN RE: S.M.L., E.R.M.L.

 Opinion of the Court

 And then if there are issues about visitation or
 further issues about custody, then it can go back to that
 court and it can be between these two young people.
 MS. JENNINGS: Okay. Thank you, your Honor.
 THE COURT: So I’ll ask each of you to share your
 orders with Ms. Harjo and Ms. Everett for their input.
 Reviews are waived.
 Guardian’s released.
 Counselor released.
 ...
 MS. CAIRO: Your Honor, I would also ask for a
 provision that -- that [Joe] be prohibited from having
 contact with either child.
 THE COURT: Yes. That should be in both orders.
 Thank you for pointing that out, Ms. Cairo. That should be
 in both the 7B order and the Chapter 50 order.

 In addition, the order on appeal included a decree that a separate order be

prepared and entered:

 Attorney Jennings shall prepare an Order reflective of the
 findings, conclusions and decretal set forth herein, and the
 same shall be filed in the existing Chapter 50 custody
 action between Respondent-Parents, to wit, New Hanover
 County Case Number 16 CVD 1965. All further hearing as
 may be necessary shall be conducted under that case file
 and shall occur in regular civil district court.

The briefs concede only one order, the one on appeal, was entered. Thus, it is not

surprising that the order on appeal fails to include all of the findings and conclusions

as required by North Carolina General Statute § 7B-911, as the trial court directed

that another order be entered to address these matters.

 Here, there was a pre-existing Chapter 50 custody proceeding in which Mother

and Father were parties and there was a custody order in effect when the petition

 - 27 -
 IN RE: S.M.L., E.R.M.L.

 Opinion of the Court

was filed. Because “the juvenile [was] already the subject of a custody order entered

pursuant to Chapter 50,” the trial court was required to enter an order which “makes

findings and conclusions that support modification of that order pursuant to G.S. 50-

13.7.” N.C. Gen. Stat. § 7B-911(c)(1) (2019). The trial court’s order did not include

any findings or conclusions regarding a substantial change in circumstances affecting

the best interests of the minor child, as required by North Carolina General Statute

§ 50-13.7. Hibshman v. Hibshman, 212 N.C. App. 113, 710 S.E.2d 438 (2011) (finding

remand for further proceedings to be required where trial court did not make a

finding showing a substantial change in circumstances before modifying custody).

 The trial court also failed to find, as required by N.C. Gen. Stat. § 7B-

911(c)(2)(a), that “[t]here is not a need for continued State intervention on behalf of

the juvenile through a juvenile court proceeding.” We therefore remand for entry of

an order terminating juvenile court jurisdiction and transferring to civil district

court, as directed by the trial court, including the appropriate findings of fact and

conclusions of law.

 VII. Visitation Order

 Mother also contends that the trial court erred in its visitation order by

allowing Sara discretion regarding visitation and cites to North Carolina General

Statute §7B-905.1(a), (c) in support of her argument. However, the Guardian ad

Litem states “[b]ecause the court placed custody with the father (not DSS) and

 - 28 -
 IN RE: S.M.L., E.R.M.L.

 Opinion of the Court

terminated the neglect case, N.C. Gen. Stat. § 7B-905.1 does not apply in regards to

visitation.” The Guardian Ad Litem is technically correct, in the sense that the trial

court intended to end DSS’s involvement in the case, to terminate jurisdiction of the

juvenile court, and to enter a custody order under NCGS 7B-911. But as discussed

above, the custody order required by NCGS 7B-911 and directed by the trial court

was not entered, and we have remanded for entry of this Order. Because the trial

court will necessarily address the details of visitation in the order on remand, we will

not further address Mother’s argument regarding Sara’s visitation. In addition, as

the trial court will need to hold a hearing on remand, the parties will have the

opportunity to present additional evidence regarding visitation arrangements which

will be in Sara’s best interest upon remand.

 VIII. Conclusion

 Because there were not sufficient findings of fact to support the trial court’s

conclusion of neglect as to Ed, we reverse the adjudication as to Ed and remand for

further findings. The trial court’s findings of fact as to Sara support its conclusion of

law regarding her adjudication as neglected. However, the trial court failed to comply

with the requirements of North Carolina General Statute § 7B-911 in terminating

jurisdiction of the juvenile court and transferring the case as a Chapter 50 matter

because the trial court failed to make findings of fact and conclusions of law regarding

modification of the existing Chapter 50 custody order and failed to make a finding

 - 29 -
 IN RE: S.M.L., E.R.M.L.

 Opinion of the Court

stating there was no need for continued intervention by the juvenile court. In

addition, the trial court failed to enter the Chapter 50 order as directed in its

rendition and mandated by the Adjudication and Disposition order on appeal, so we

must remand for entry of the Chapter 50 order in accord with North Carolina General

Statute § 7B-911. Accordingly, we affirm in part, reverse in part, and remand for

further proceedings.

 On remand, the trial court shall hold a hearing and receive additional evidence

as it deems appropriate to address the issues noted in this opinion and to enter a new

order addressing the allegations of neglect as to Ed, an order addressing the

termination of juvenile jurisdiction and transfer to the Chapter 50 custody action,

and appropriate visitation provisions for Sara in accord with the trial court’s findings

on remand.

 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

 Judges INMAN and YOUNG concur.

 - 30 -